WHEELER *v.* BOARD OF TRUSTEES OF FARGO CONSOLIDATED SCHOOL DISTRICT *et al; et vice versa.*

Nos. 15393, 15394. FEBRUARY 20, 1946. REHEARING DENIED MARCH 5, 1946.

326

*Downing Musgrove, Sumter M. Kelley,* and *Spalding, Sibley & Troutman,* for plaintiff.

*J. B. Copeland,* for defendants.

*Sam M. Mathews,* as amicus curiæ.

*Eugene Cook, Attorney-General* and *R. A. McGraw, Assistant Attorney-General,* for person at interest not party.

WYATT, J. ■ The first question with which we must deal is whether or not the Justices of this court are disqualified. The instrument voted upon August 7, 1945, and put into effect by proclamation of the Governor on August 13, 1945, raised the salaries of the Justices of this court from $7000 to $8000 per annum. All Justices, therefore, have a direct pecuniary interest in the outcome of this litigation. The Code, § 24-102, provides, among other things, that no judge or justice of any court shall sit in any cause or proceeding in which he is pecuniarily interested. It necessarily follows that every member of this Court is disqualified.

The next question is how the place of a disqualified Justice can be filled. Both the instrument voted upon August 7, 1945, and the constitution of 1877 as amended (Ga. L. 1937, p. 33) provide that superior court judges shall be designated to preside on the Supreme Court in the place of disqualified Justices of the Supreme Court. There is no authority under our law for the designation of anyone to preside in the place of a disqualified

Supreme Court Justice other than a superior court judge. The same instrument, raising the Supreme Court Justices' salaries from $7000 to $8000 per annum also raised the salaries of all superior court judges from $5000 to $6000 per annum.

We are confronted with this situation: All Supreme Court Justices are disqualified; all superior court judges are likewise disqualified. Hence, it is impossible, under the law, to obtain a court with a qualified membership to pass upon this case. The precise question we must now determine is, when all Justices of this court are disqualified, and all superior court judges are likewise disqualified, thereby resulting in a situation where no qualified court can be constituted, what shall be done? The rule is laid down in 30 Am. Jur. 770, § 55: "By the great weight of authority, the rule of disqualification must yield to the demands of necessity, and a judge or an officer exercising judicial functions may act in a proceeding wherein he is disqualified by interest, relationship, or the like, if his jurisdiction is exclusive, and there is no legal provision for calling in a substitute, so that his refusal to act would destroy the only tribunal in which relief could be had and thus prevent a determination of the proceeding. Under such circumstances, it is the duty of the disqualified judge to hear and decide the controversy, however disagreeable it may be."

Evans v. Gore, 253 U. S. 245 (40 Sup. Ct. 550, 64 L. ed, 887, 11 A. L. R. 519), was a case which involved the question whether Congress could levy an income tax on the salary of a Federal district judge, and which likewise affected the salaries of the Justices of the Supreme Court of the United States. There the court said: "Because of the individual relation of the members of this court to the question, thus broadly stated, we cannot but regret that its solution falls to us. . . But jurisdiction of the present case cannot be declined or renounced. The plaintiff was entitled by law to invoke our decision on the question as respects his own compensation . . and there was no other appellate tribunal to which under the law he could go. . . In this situation, the only course open to us is to consider and decide the cause—a conclusion supported by precedents reaching back many years."

In Long v. Watts, 183 N. C. 99 (110 S. E. 765, 22 A. L. R. 277), the Supreme Court of North Carolina had under consideration the right to tax the salary of a judge, the decision also af-

fecting the right to tax the salaries of the members of the Supreme Court. There the court used substantially the same language quoted from Evans v. Gore, supra, and said further: "This much is said not by way of apology, but in recognition of the proprieties of the situation. No other choice is given to us, and we should be recreant to our duty if, when a cause is submitted by a citizen who alleges that his rights have been violated, or by an officer who wishes to know the law, we should shrink from deciding it."

Many authorities could be cited of the general import of those above cited. We deem this unnecessary, but state that—gathered from all the authorities—the courts very generally agree that in a situation such as is presented in the instant case, justices, although disqualified, must preside. The reason for the rule can be readily seen from the facts of the case now under consideration. If the Justices of this court should not function in this case, no court could be lawfully assembled to decide the case, and the people of the State would be placed in the unenviable position of not knowing whether they have a legal constitution. The welfare of the public is paramount. Government must not break down. We conclude that, although the Justices of this court are disqualified on account of pecuniary interest in the subject-matter of the litigation, nevertheless they must decide this case, for the reason that there is no other tribunal to do so, and none can be legally constituted.

As to Justice Candler, the additional question is raised that the instrument now under consideration increased the membership of this court from six to seven, and he was appointed to fill the seventh place, and that, therefore, the very existence of the office he now occupies is dependent upon the outcome of this case. This position is well taken. Should he participate in this case, his very act in so doing would presuppose the validity of the instrument under attack. It appears that the validity of the instrument should be determined by the court as constituted prior to the alleged adoption of the instrument under which he claims office. He feels, therefore, that he should not participate; and in this view all members of the court concur.

As to Justice Head, it is contended that he is disqualified for the further reasons that he, was as Justice Candler, a member of the commission provided for in the resolution of the General

Assembly approved March 17, 1943 (Ga. L. 1943, p. 1680), and, also, that he while Attorney-General of the State of Georgia gave legal opinions concerning the instrument now under attack. The facts of these contentions are true, and ordinarily might amount to a good reason for disqualification. The position of Justice Head, however, was created by the Constitution of this State as it existed prior to 1945, which is not under attack. His view is that, as to these facts as a basis for disqualification, the rule of necessity applies with the same force and effect as his disqualification on account of pecuniary interest, and he declines to disqualify. In this the other members of the court concur.

■ The question we consider first in importance is whether or not the instrument contained in Ga. L. 1945, p. 8, is a valid provision of our constitutional law. It is insisted that the instrument, if considered as an amendment to the constitution of 1877, contains more than one subject-matter, and for this reason violates article 13, section 1, paragraph 1 of the constitution of 1877, which reads as follows: "Any amendment or amendments to this constitution may be proposed in the Senate or House of Representatives, and if the same shall be agreed to by two-thirds of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, with the yeas and nays taken thereon. And the General Assembly shall cause such amendment or amendments to be published in one or more newspapers in each Congressional district, for two months previous to the time of holding the next general election, and shall also provide for a submission of such proposed amendment or amendments to the people at the said next general election, and if the people shall ratify such amendment or amendments, by a majority of the electors qualified to vote for members of the General Assembly, voting thereon, such amendment or amendments shall become a part of this Constitution. When more than one amendment is submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment separately." It is insisted that we are dealing with a complete constitution, covering every department of our State Government, and it cannot be construed to be one amendment. We must determine whether or not we are dealing with an amendment to the constitution of 1877. The General Assembly in the resolution (Ga. L. 1945), supra,

calls it in the first instance "one single amendment," and in the very last words of the same resolution "the revised Constitution of Georgia."

We find the following definitions in 3 Words and Phrases, p. 319: "Amendment of a statute implies its survival and not destruction. It repeals or changes some provision, or adds something thereto. . . A law is amended when it is in whole or in part permitted to remain, and something is added to or taken from it, or it is in some way changed or altered to make it more complete or perfect, or to fit it the better to accomplish the object or purpose for which it was made, or some other object or purpose."

In Ellingham v. Dye, 178 Ind. 336 (99 N. E. 1, Ann. Cas. 1915C, 200), a completely revised constitution was proposed by the General Assembly in a manner very similar to what was done in Georgia in the instant case. The court there held that instrument not to be a single amendment, but a completely revised or new constitution. It seems to us that the instrument now under consideration discloses by its own terms the answer to the question we now have for determination. The very first paragraph repeals in its entirety the constitution of 1877, and then proceeds to create a new constitution. When a house is completely demolished and another is erected on the same location, do you have a changed, repaired and altered house, or do you have a new house? Some of the material contained in the old house may be used again, some of the rooms may be constructed the same, but this does not alter the fact that you have altogether another or a new house. We conclude that the instrument as contained in Ga. L. 1945, pp. 8 to 89, inclusive, is not an amendment to the constitution of 1877; but on the contrary it is a completely revised or new constitution. We will hereafter refer to the instrument as the constitution of 1945.

■ We now consider whether the instrument is valid as a new constitution. The constitution of 1877, article 13, section 1, paragraph 2 (Code, § 2-8602), provides as follows: "No convention of the people shall be called by the General Assembly to revise, amend or change this constitution, unless by the concurrence of two-thirds of all the members of each house of the General Assembly. The representation in said convention shall be based on population as near as practicable." It is contended that this

provision means that a completely revised or new constitution can be formulated by a convention, and in no other manner. We are now dealing with a written constitution—the original law by which our system of government was set up. It creates the government. By its provisions the three branches of our government —legislative, executive, and judicial—are created. The three branches of government must look to it for all their power and authority. Not so with the sovereign power, the people. Under our system of government all power and authority is vested in the sovereign people, subject only to such limitations as they have expressly imposed upon themselves by this organic law, the constitution. With this as the basis from which we reason, is it true that this provision of the constitution of 1877 limits the power of the sovereign people to a convention as the only means by which they can have a completely revised or new constitution? The language does not say so. The section purports to do nothing more than to place limitations upon the legislative branch of government as to the manner in which a convention can be called by this branch of the government. If we should say that the sovereign people themselves can adopt a new constitution by the convention method only, we would by implication be writing into this clause of the constitution a limitation on the sovereign power of the people. We do not hesitate to say that a court is never justified in placing by implication a limitation upon the sovereign. This would be an unauthorized exercise of sovereign power by the court. In State *v.* Swift, 69 Ind. 505, 519, the Indiana Supreme Court said: "The people of a State may form an original constitution, or abrogate an old one, and form a new one, at any time, without any political restriction except the Constitution of the United States; but if they undertake to add an amendment, by the authority of legislation, to a constitution already in existence, they can do it only by the method pointed out by the constitution to which the amendment is to be added. The power to amend a constitution by legislative action does not confer the power to break it, any more than it confers the power to legislate on any other subject contrary to its prohibitions."

No case identical in its facts with the case now under consideration has been called to our attention, and we have found none. We think that the principle which we apply in the instant case

was very clearly applied in the creation of the Constitution of the United States. The convention created by a resolution of Congress had authority to do one thing, and one only, to wit, amend the articles of confederation. This they did not do, but submitted to the sovereign power, the people, a new constitution. In this manner was the Constitution of the United States submitted to the people, and it became operative as the organic law of this nation when it had been properly adopted by the people.

Pomeroy's Constitutional Law, p. 55, discussing the convention that formulated the Constitution of the United States, has this to say: "The convention proceeded to do, and did accomplish, what they were not authorized to do by a resolution of Congress that called them together. That resolution plainly contemplated amendments to the articles of confederation, to be submitted to and passed by the Congress, and afterwards ratified by all the State legislatures, in the manner pointed out by the existing organic law. But the convention soon became convinced that any amendments were powerless to effect a cure; that the disease was too deeply seated to be reached by such tentative means. They saw that the system they were called to improve must be totally abandoned, and that the national idea must be re-established at the center of their political society. It was objected by some members that they had no power, no authority, to construct a new government. They had no authority, if their decisions were to be final; and no authority whatever, under the articles of confederation, to adopt the course they did. But they knew that their labors were only to be suggestions; and that they as well as any private individuals, and any private individuals as well as they, had a right to propose a plan of government to the people for their adoption. They were, in fact, a mere assemblage of private citizens, and their work had no more binding sanction than a constitution drafted by Mr. Hamilton, in his office, would have had. The people, by their expressed will, transformed this suggestion, this proposal, into an organic law, and the people might have done the same with a constitution submitted to them by a single citizen."

True it is that this was a convention, but it was a convention authorized to do nothing other than amend the articles of confederation, which was the constitution under which this government was then operating. It had no more express authority to

frame and submit to the people a new constitution than did the Georgia legislature, or the committee provided for by the resolution. Ga. L. 1943, p. 1680. That convention simply recognized the right of the people, the sovereign, to adopt a new constitution framed by any one, or submitted from any source, so long as the people were not restricted from so doing by the constitution then in force, and so long as the expression of the people was made manifest in a legal way. When the people adopt a completely revised or new constitution, the framing or submission of the instrument is not what gives it binding force and effect. The fiat of the people, and only the fiat of the people, can breathe life into a constitution.

The constitution of 1877, article 1, section 5, paragraph 1 (Code, § 2-501), provides as follows: "The people of this State have the inherent, sole, and exclusive right of regulating their internal government, and the police thereof, and of altering and abolishing their constitution whenever it may be necessary to their safety and happiness." In the face of this express reservation of power by the sovereign people in their organic law to abolish or change their constitution, can this court say by implication that they are limited to the convention method in so doing? We do not think so.

It is insisted that Ellingham v. Dye, supra, is authority for the position that a convention is necessary if there is to be a complete revision or a new constitution. In the State of Indiana there was a provision in the constitution that at stated intervals there should be submitted to the people by ballot the question as to whether or not there should be a constitutional convention. This to our minds clearly differentiates the Indiana case from the instant case. Our attention is also called to the statement by Jameson in his book "Constitutional Conventions" to the effect that a convention is indispensable when a new constitution is framed. We recognize Jameson as one of the best text authorities on this subject, but do not agree with his statement as a universal rule or as applied to this case where the constitution of 1877 contains no such limitation on the power of the sovereign people. Bearing in mind the well-established rule that every reasonable presumption, both of law and fact, is to be indulged in favor of the validity of a constitution when it is attacked after its ratification by the people,

we are clear that the people of Georgia, under the provisions of the constitution of 1877, are not restricted to the convention method of securing for themselves a new constitution. If a constitution is to be a legal one, as distinguished from a revolutionary constitution, it must be adopted by the people by a compliance with the legal machinery in operation at the time of its adoption in order to obtain a legal expression of the will of the people. We are therefore confronted with the question, was the constitution of 1945 adopted by the people of Georgia in the above-indicated manner?

Under our system of government the method of expressing the will of the people is by voting in a legally held election. The legislative branch of our government is charged with the duty of providing the manner of holding elections and providing for the ballot, and what shall go on the ballot—of course subject to the limitations contained in the constitution. It will be noted from the quoted provisions of the constitution of 1877 that, before any question concerning the constitution can legally be placed upon a ballot, there must be a concurrence of two-thirds of all the members of each house of the General Assembly. This is the requirement if an amendment is to be proposed, or if a convention is to be called. We think the clear implication is that no question concerning a change in the constitution, or the creation of a new constitution, shall ever be placed upon a ballot for submission to the people until the General Assembly has by a two-thirds vote authorized the placing of the proposition on the ballot. If it be said that we are arriving at this conclusion by implication, and refuse by implication to restrict the method of formulating a new constitution to a convention, a sufficient answer is: restricting by implication the legislative or any other branch of our government, created by the constitution, is one thing; and restricting by implication the sovereign right and power of the people is another and altogether different thing.

The journal of the House of Representatives discloses the vote on the resolution to have been 180 yeas and 3 nayes; the Senate journal discloses the vote to have been 38 yeas and 9 nayes; so that the proposition was legally placed on the ballot. The proposal was duly advertised and submitted to a vote of the people at a general election. The vote of the people was 60,065 for rati-

fication and 34,417 against ratification. The Governor duly issued his proclamation on August 13, 1945. We conclude that the constitution of 1945 was and is a valid and legal expression of the will of the people, and that the instrument now under consideration has been duly and legally proclaimed as the Constitution of Georgia.

■ It is contended that, if the constitution of 1945 was duly ratified and is controlling, the bonds in the instant case cannot issue and the tax in question can not be levied because: "(1) The effect of the new constitution was to abolish Fargo School District; and (2) this school district having been abolished, neither it nor the County Board of Education could issue and deliver said bonds; and (3) that neither the Board of Trustees of the Fargo School District nor the Board of Education could recommend the levy of a tax to the Commissioners of Roads and Revenues, and therefore any tax attempted to be levied, either on the property located in what used to constitute Fargo School District or on a county-wide basis would be illegal and void; and (4) even if the Fargo School District retains some form of legal existence, nevertheless, all of the necessary steps to authorize a bond issue not having been taken prior to August 13, 1945, any steps taken thereafter would be without authority in law by reason of the conflicts existing between the new constitution and the statutory laws authorizing school districts of the State to issue bonds."

The General Assembly in 1919 (Ga. L. 1919, p. 288; Code, §§ 32-901 et seq.), enacted a very comprehensive code of school laws. It is therein provided that "Each and every county shall compose one school district and shall be confided to the control and management of a county board of education." The act of 1919 made further detailed provisions for local school districts, local trustees, local school bonds, and the manner of levying and collecting the money with which to retire local school bonds—the purposes for which bonds can be issued by local school districts being "building and equipping a school house or school houses for said school district." The constitution of 1945 simply made constitutional the first-quoted portion of the act of 1919, thereby creating a constitutional board of education for the counties, and that is all this provision did. The remainder of the school code of 1919 is not mentioned in the constitution. The new constitu-

tion further provides: "The General Assembly shall have authority to make provision for local trustees of each school in a county system and confer authority upon them to make recommendations as to budgets and employment of teachers and other authorized employees"—a plain recognition of the fact that local school districts, including local school trustees, continued in existence.

Article 12, section 1, paragraph 3 of the constitution of 1945 provides: "All laws now of force in this State, not inconsistent with this constitution shall remain of full force until the same are modified or repealed by the General Assembly." It seems clear to us that the statutory law with reference to local school districts, their trustees, their power to issue bonds, and the manner of providing a tax for the retirement of bonds, remains in full force and effect, and will remain so until and unless changed by the General Assembly. Such changes as the constitution of 1945 may make with reference to the levy and collection of a maintenance tax for schools has no application to local school bonds.

(a) Our attention has been called to House Bill No. 793, approved February 1, 1946. In the instant case the bonds in question had been voted upon and authorized and had been validated by a judgment of the superior court, and the bonds had been issued and the tax levy actually made. We will not give the above-referred-to act of the legislature such retroactive effect as to have any application to the issues in this case.

The approval of these bonds by the electors and their validation according to statute created a status analogous to a contractual relation between such electors and the State, which could not be destroyed or impaired by a subsequent statute or constitutional provision, and therefore, whether the act of February 1 be otherwise valid or invalid, it would not prevent sale and delivery of the bonds as binding and enforceable obligations of the school district. See, in this connection, Code, §§ 1-134, 2-302; 43 Am. Jur. pp. 276, 356, §§ 9, 105; Perry v. Los Angeles, 187 Cal. 753 (203 Pac. 992, 19 A. L. R. 1044); Golden Gate Bridge & Highway District v. Filmer, 217 Cal. 754 (21 Pac. 2d, 112, 91 A. L. R. 1); O'Farrell v. Sonoma County, 189 Cal. 343 (208 Pac. 117); White v. Hart, 80 U. S. 646 (4) (20 L. ed. 685).

*Judgment affirmed on both the main and cross-bills of exceptions. All the Justices concur, except Candler, J., not participating.*