314 Ga. 555
FINAL COPY

S22A0727. GARCIA-JARQUIN v. THE STATE.

COLVIN, Justice.

Following a jury trial, Appellant Ylarrio Garcia-Jarquin was convicted of malice murder, aggravated assault, and possession of a firearm during the commission of a felony in connection with the shooting death of Edel Mendoza and the aggravated assault of Miguel Canil.[1] Appellant claims that the evidence presented at trial

---

[1] On October 10, 2016, a Cherokee County grand jury indicted Appellant on charges of malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), aggravated assault of Mendoza (Count 3), aggravated assault of Canil (Count 4), and possession of a firearm during the commission of a felony (Count 5). At a jury trial held from August 28 to September 1, 2017, the jury found Appellant guilty of all charges. The trial court sentenced Appellant to life in prison for malice murder, twenty years consecutive for the aggravated assault of Canil, and five years for the weapon charge to run consecutive to the aggravated assault. The remaining counts were either vacated by operation of law or merged for sentencing purposes.

Appellant filed a motion for new trial through new counsel on December 4, 2017, and amended the motion on October 19, 2020. After conducting a hearing, the trial court denied the motion as amended on January 26, 2022. Appellant timely filed a notice of appeal. The appeal was docketed to the April 2022 term of this Court and submitted for a decision on the briefs.

After the appeal was docketed, the State, "out of an abundance of caution," filed a motion to transfer the case to the Court of Appeals because

was insufficient to support his conviction for the aggravated assault

of Canil.[2]  For the reasons that follow, we affirm.

When evaluating the sufficiency of evidence as a matter of

constitutional due process, we must determine whether, viewing the

evidence in the light most favorable to the verdict, "any rational trier

of fact could have found the essential elements of the crime beyond

a reasonable doubt." *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B)

(99 SCt 2781, 61 LE2d 560) (1979) (emphasis omitted).  "This Court

does not reweigh evidence or resolve conflicts in testimony; instead,

---

Appellant only challenged his conviction for the aggravated assault of Canil. However, because Appellant's conviction for aggravated assault arises out of his murder case, was brought under the same indictment as his murder charge, and was obtained in the same trial as his murder conviction, this Court retains jurisdiction.  See, e.g., *Neal v. State*, 290 Ga. 563, 567 (722 SE2d 765) (2012) (Hunstein, C. J., concurring, opinion joined by all Justices, reiterating that this Court's constitutional jurisdiction extends to all direct appeals in murder cases).  Therefore, we deny the State's motion to transfer.

[2] Appellant does not challenge the sufficiency of the evidence concerning his convictions for malice murder and possession of a firearm, and this Court no longer routinely reviews the sufficiency of the evidence sua sponte in non-death penalty cases.  See *Davenport v. State*, 309 Ga. 385, 391-392 (4) (846 SE2d 83) (2020).

2

evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013) (citation and punctuation omitted).

Viewing the evidence in this light, the record shows that, on July 18, 2016, Appellant drank beer at the Taqueria Oaxaqueña for approximately six hours. Surveillance recordings showed that Appellant left the restaurant around 6:30 p.m. and returned approximately 20 minutes later carrying a firearm. Upon his return, Appellant continued to drink.

Mendoza arrived at the restaurant with two men, one of whom was Canil. Soon thereafter, Appellant began taunting Mendoza by pointing his finger like a gun and patting his right hip where his gun was concealed. The men exchanged some words but did not approach one another. Mendoza turned to talk to Canil and eat his food; meanwhile, Appellant approached the cash register and told

3

the waitress that "[Mendoza] thinks he's all that." Appellant walked toward Mendoza's table with his hand resting on his right hip and made more threatening gestures. Appellant lifted his shirt, showing off his gun, and told the men that he "[was] not afraid." Canil testified at trial that this scared him because he thought Appellant could "shoot [his entire group]," so he "just wanted to get out of there."

Appellant walked to the jukebox and played two songs: one describing the violent nature of cartel leader El Chapo and one about a pistol duel. Appellant passed Mendoza's table one more time, once again using his hands to mimic shooting a gun. When Mendoza stood, Appellant pulled a gun and pointed it at his chest. Mendoza grabbed a chair and ran away carrying it as a shield, but Appellant continued tracking him with the gun and pulled the slide back. Other patrons, including Canil, took cover. Appellant shot Mendoza three times; Mendoza fell to the ground and eventually died of his

4

wounds.  Canil testified that, though Appellant never pointed the gun at him, he was scared that he "might [also] get shot" and that the incident left him "traumatized."

Appellant fled the restaurant and was later found in a nearby field with a gun in his possession. Ballistics analysis of the shell casings and bullets recovered from the crime scene showed that the gun found on Appellant was the gun used in the shooting.  Appellant spoke with police and admitted shooting Mendoza, but he claimed he did so out of self-defense.

Appellant claims that the evidence was legally insufficient to support his conviction for the aggravated assault of Canil because the State failed to establish that Appellant pointed a weapon at Canil.  We disagree.  Aggravated assault occurs when a person "assaults . . . [w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury."  OCGA § 16-5-21

5

(a) (2). A person commits an assault when he "[c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury." OCGA § 16-5-20 (a) (2). Contrary to Appellant's assertion, "OCGA § 16-5-21 (a) (2)[ ] does not require the deadly weapon to have been pointed directly at each victim, but merely that the defendant use the deadly weapon in such manner as to place another in reasonable apprehension of immediately receiving a violent injury." *Green v. State*, 304 Ga. 385, 388 (1) (a) (818 SE2d 535) (2018) (citation and punctuation omitted).

Here, the evidence presented at trial showed that Appellant harassed and taunted Mendoza throughout the night, that Appellant showed Mendoza and Canil a gun and said "he [was] not afraid," that Canil was scared by Appellant's threats, and that Canil ran for cover as soon as Appellant fired his weapon. This evidence was sufficient to establish that Canil was placed in reasonable apprehension of immediately receiving a violent injury. See *Howard*

6

*v. State*, 288 Ga. 741, 742 (1) (707 SE2d 80) (2011) ("Testimony that the victims ran from the gunfire is sufficient evidence that Appellants placed them in reasonable apprehension of immediately receiving a violent injury."); *Roberts v. State*, 267 Ga. 669, 671 (1) (482 SE2d 245) (1997) (sufficient evidence to support aggravated assault conviction where victim testified that he ran when he saw two men start shooting and other people being shot). Accordingly, the jury was authorized to find Appellant guilty beyond a reasonable doubt of the aggravated assault of Canil. See *Jackson*, 443 U. S. at 319 (III) (B).

*Judgment affirmed. All the Justices concur, except Pinson, J., not participating.*

BETHEL, Justice, concurring.

I concur fully in the judgment reached in this case and the reasoning we have applied in rejecting the appellant's claim of error. However, I write separately to question the nature of this Court's jurisdiction and to invite a careful consideration of that question.

This Court has long exercised jurisdiction over all cases in which the appellant has been found guilty of murder. From 1945 until 1983, that jurisdiction was based on the provision of the Georgia Constitutions of 1945 and 1976, respectively, which gave this Court jurisdiction over "all cases of conviction of a capital felony." See Georgia Constitution of 1945, Art. VI, Sec. II, Par. IV (providing that the jurisdiction of the Supreme Court includes "all cases of conviction of a capital felony"); Georgia Constitution of 1976, Art. VI, Sec. II, Par. IV (same). See also *Collins v. State*, 239 Ga. 400, 402 (2) (236 SE2d 759) (1977) (determining that "capital felony" means "felonies to which the death penalty is affixed as a

8

punishment under given circumstances," as opposed to felonies "in which under no circumstances would death ever be inflicted as a penalty" (citation, punctuation and emphasis omitted)). Our current Constitution changed that provision to confer upon this Court jurisdiction over "[a]ll cases in which a sentence of death was imposed or could be imposed." Georgia Constitution of 1983, Art. VI, Sec. VI, Par. III (8).

Because, at all relevant times, murder has been a capital felony in Georgia, it is clear to me that under the 1945 and 1976 Georgia Constitutions, this Court had jurisdiction over all appeals in murder cases, even those in which the death penalty was not sought or imposed. But despite this Court's longstanding practice, I interpret the plain language of the 1983 Constitution to have limited our jurisdiction over appeals in murder cases to only those cases in which, at the time of the appeal, a sentence of death has been imposed, cases where the State is actively seeking the death penalty,

9

and cases where a possibility remains that the State could seek the death penalty. By changing the jurisdictional definition from the crime (capital felonies) to the punishment (cases in which a sentence of death was or could be imposed), the new constitutional language eliminated a large category of cases from this Court's jurisdiction: direct appeals following a conviction in cases in which a sentence of death was not imposed. And this change also impacted a smaller category of cases subject to this Court's jurisdiction: interlocutory appeals where the procedural posture of the case definitively excludes the possibility that the death penalty will be imposed. Further, subsequent developments in the United States Supreme Court's jurisprudence regarding the imposition of the death penalty have likewise limited the scope of cases in which a sentence of death *could be* imposed.[3]

---

[3] Since the adoption of the 1983 Constitution, the United States Supreme Court has determined that a number of procedural requirements, such as the

Like so many appeals in murder cases that this Court has ruled upon since the 1983 Constitution came into effect, at no point in this case did the district attorney seek the death penalty, much less file a notice that the State intended to seek the death penalty against the appellant, see Unified Appeal Procedure, Rule II (C) (1) (requiring the State to provide pre-trial written notice to seek the death penalty); *Wagner v. State*, 282 Ga. 149, 152-153 (6) (646 SE2d 676) (2007) (addressing written notices to seek the death penalty

giving of pre-trial notice, apply when the State seeks to impose the death penalty. See, e.g., *Lankford v. Idaho*, 500 U. S. 110, 121-122 (II) (111 SCt 1723, 114 LE2d 173) (1991) (holding that adequate notice to seek death penalty is required under Due Process Clause for the State to seek a death sentence). In addition, the Supreme Court's rulings have steadily limited the availability of the death penalty based on the type of crime committed, the age and mental capacity of the defendant, and other factors. See, e.g., *Hall v. Florida*, 572 U. S. 701, 704 (134 SCt 1986, 188 LE2d 1007) (2014) ("[T]he Eighth and Fourteenth Amendments to the [United States] Constitution forbid the execution of persons with intellectual disability."); *Kennedy v. Louisiana*, 554 U. S. 407 (128 SCt 2641, 171 LE2d 525) (2008) (holding that the Eighth Amendment prohibits the death penalty for rape where the crime did not result in the victim's death); *Roper v. Simmons*, 543 U. S. 551 (125 SCt 1183, 161 LE2d 1) (2005) (holding that the death penalty cannot be imposed against juvenile offenders). These decisions have necessarily narrowed the range of cases in which the death penalty in Georgia "could be imposed."

with respect to the Unified Appeal Procedure and the requirements of due process); OCGA § 17-10-36 (a) (requiring the promulgation of the Unified Appeal Procedure), nor did the jury impose a sentence of death.[4] And, although a sentence of death *can* be available for one who is found guilty of murder, the appellant was sentenced to a term of life imprisonment, not the death penalty, and the State has not challenged that sentence on appeal. Thus, under our State's laws and the significant body of law that has developed in recent decades regarding the imposition of a death sentence in the United States, I feel compelled to conclude this appeal is not among the "*cases* in which a sentence of death was imposed or *could be* imposed." Georgia Constitution of 1983, Art. VI, Sec. VI, Par. III (8) (emphasis supplied). Because no other provision of the Georgia Constitution or any statute appears to give this Court exclusive jurisdiction over

---

[4] It is also worth noting that at no point has the State suggested or argued that any of the aggravating factors required to pursue the death penalty are present in this case. See OCGA § 17-10-30 (b).

12

this case and numerous others like it in the years since the above-cited provision of the Georgia Constitution of 1983 took effect, I write separately to renew the dialogue among this Court's members (and perhaps beyond) regarding our jurisdiction over every direct appeal arising from a case in which a defendant has been convicted of murder, regardless of whether a death sentence was imposed or ever sought in the first place.[5]

My reading of Georgia Constitution of 1983, Art. VI, Sec. VI, Par. III (8) seems to be in accord with this Court's initial interpretation of this constitutional provision. In *State v. Thornton*, 253 Ga. 524, 524 (1) (322 SE2d 711) (1984), this Court determined that it lacked jurisdiction over the appeal and that it had been properly filed in the Court of Appeals. However, citing no

---

[5] The procedural posture of this case only further points to the need to revisit this question. Here, the appellant has not raised an enumeration of error related to his murder conviction. See Maj. Op. at 555 n.2. It appears that this fact prompted the State to file a motion to transfer this appeal to the Court of Appeals. See Maj. Op. at 555 n.1.

13

constitutional or statutory authority, the Court announced that "[a]s a matter of policy," it deemed it appropriate that this Court review murder cases. Id. It then ordered the Court of Appeals to transfer to this Court

> all cases in which either a sentence of death or of life imprisonment has been imposed upon conviction of murder, and all pre-conviction appeals in murder cases, whether or not timely notice was given by the district attorney as required by [the Unified Appeal Procedure].

Id.

This Court and the Court of Appeals appear to have operated under the "policy statement" expressed in *Thornton* without much further consideration until 1999. That year, then-Chief Justice Benham wrote a special concurrence in *Weatherbed v. State*, 271 Ga. 736, 739 (524 SE2d 452) (1999), in which he called on the Court to "comply with the change in its appellate jurisdiction in non-capital murder cases brought about by the passage of the 1983 Georgia Constitution," as recognized in *Thornton*. The former Chief Justice

14

noted that *Thornton* had properly interpreted the change to the Court's jurisdiction brought on by the 1983 Constitution but lamented that, "[f]or policy reasons not identified" in *Thornton*, the Court had continued to exercise jurisdiction over all appeals in murder cases. Id. at 740 (Benham, C. J., concurring specially). Chief Justice Benham then suggested that the 1983 Constitution had limited the Court's jurisdiction to "cases in which a defendant has been sentenced to death," cases "in which the possibility of the imposition of the death penalty still exists," death penalty cases at the interim review phase, and "interlocutory appeals arising in cases where the defendant has been charged with a crime punishable by death" if the death penalty could still be pursued by the State at the time of the appeal. Id. at 740-741.

Then-Chief Justice Benham's calls for reform went unheeded, and issues regarding the scope of the Court's jurisdiction over murder cases appear to have avoided the Court's published

15

consideration until 2009. That year, in a 4-3 decision in *State v. Murray*, 286 Ga. 258, 259 (1) (687 SE2d 790) (2009), the Court determined that its jurisdiction over appeals in murder cases extended to appeals from contempt orders issued against a prosecutor in an underlying murder prosecution. The Court determined that the jurisdictional issue focused "on the nature of the underlying action," rather than the relief sought on appeal, noting that "[i]f the underlying action is a murder case, this Court has jurisdiction of the appeal, regardless of whether the order being appealed is based on facts having some bearing on the underlying criminal trial." Id. (citation and punctuation omitted). Then-Presiding Justice Carley authored a concurrence joined by then-Justice Hines, noting that *Thornton* had, as a matter of policy, established a bright-line rule that had "serve[d] both Georgia appellate courts well." Id. at 260 (Carley, P. J., concurring).

Then-Justice Melton, in dissent, reasoned that the majority in

16

*Murray* had "judicially [rewritten] our constitutionally-mandated jurisdiction" to include cases involving contempt of court, which it had previously held was not within its appellate jurisdiction. Id. at 260-261 (Melton, J., dissenting) (citing *Nowlin v. Davis*, 278 Ga. 240, n.1 (599 SE2d 128) (2004)). Then-Justice Nahmias also dissented, reasoning that the appeal in *Murray* was moot. Id. at 264 (1) (Nahmias, J., dissenting). He also agreed with Justice Melton that the appeal from the contempt order was "too collateral to the murder case in which it happened to arise for our jurisdiction to rest upon *Thornton*" and that the Court had no other reason for taking jurisdiction. Id.

Then-Justice Nahmias elaborated that, although *Thornton* cited no authority and provided little reason for its holding requiring the Court of Appeals to transfer murder appeals to the Supreme Court, *Thornton*'s holding could be followed because of the Court's "almost-unlimited certiorari jurisdiction," id. at 266 (2) (b)

17

(Nahmias, J., dissenting) (noting this Court's holding in *Daniels v. State*, 248 Ga. 591, 591-592 n.1 (285 SE2d 516) (1981), that the Supreme Court has the constitutional authority to require, by certiorari or otherwise, any case to be certified from the Court of Appeals, even before it is decided by that Court). The Nahmias dissent then noted that the Georgia Constitution gives the Court discretion to take cases from the Court of Appeals, the exercise of which may be guided by policy considerations. Id.

The Court returned to this issue again in *Neal v. State*, 290 Ga. 563 (722 SE2d 765) (2012), in a concurrence authored by then-Chief Justice Hunstein and joined by all other members of the Court. The concurrence determined that the Court had jurisdiction in all murder cases under Art. VI, Sec. VI, Par. III (8) of the 1983 Constitution because "murder cases are a class of cases in which a sentence of death could be imposed." *Neal*, 290 Ga. at 567 (Hunstein, C. J., concurring). The concurrence noted that the Supreme Court of

18

Georgia has always had appellate jurisdiction over all murder cases and that the 1983 Constitution had not disturbed that arrangement. It rested this determination both on the fact that murder remains the only offense for which a sentence of death can be imposed constitutionally and that our murder statute provides for death as a possible punishment.[6] Moreover, the concurrence examined both the

---

[6] This conclusion that the death penalty can only be imposed in murder cases is also dubious. Prior to *Neal*, this Court recognized that the death penalty could be imposed for the offense of kidnapping with bodily injury under OCGA § 16-5-40 (b) where the bodily injury was the victim's death and the defendant was not convicted of murder. See *Sears v. State*, 270 Ga. 834, 841-842 (4) (514 SE2d 426) (1999); OCGA § 16-5-40 (d) (4) (providing for a sentence of "[l]ife imprisonment or death if the person kidnapped received bodily injury"). And although the Supreme Court's decision in *Kennedy* sharply limited the range of offenses for which the death penalty is available, the Court's dicta in that case at least left open the possibility that the offenses of aircraft hijacking (OCGA § 16-5-44 (c)) and treason (OCGA § 16-11-1 (b)) also remain death-eligible in Georgia. See 554 U. S. at 437 (IV) (A) ("Our concern here is limited to crimes against individual persons. We do not address, for example, crimes defining and punishing treason, espionage, terrorism, and drug kingpin activity, which are offenses against the State. As it relates to crimes against individuals, though, the death penalty should not be expanded to instances where the victim's life was not taken."). With that statement by the Supreme Court in mind, I also take issue with a statement in our Court's decision in *Bradshaw v. State*, 284 Ga. 675, 681 (3) (671 SE2d 485) (2008). There, we stated, rather curiously, that "[l]ife imprisonment is the only

19

drafting history of the 1977 convention that drafted the proposed 1983 Constitution and the transcripts of committee meetings in which these provisions were discussed. The Court gleaned from those materials that, despite wording changes to the provisions governing the Court's jurisdiction, "the language . . . was intended to maintain the existing jurisdiction of the appellate courts," thus moving away from the Court's statements in *Thornton* to the contrary. Id. at 571 (Hunstein, C. J., concurring).

I am unmoved by the analysis of the committee deliberations in the *Neal* concurrence. See id. The well-documented reasons to distrust legislative history apply, perhaps with even greater force,

---

punishment available for the [crime] of hijacking an aircraft" even though OCGA § 16-5-44 (c) clearly provides for a sentence of death for that offense. It appears to me, however, that this statement may have been made in the context of discussing the minimum sentence available for the offense of aircraft hijacking, as that was the context in which the available sentences for aircraft hijacking and a number of other Georgia offenses were being discussed in *Bradshaw*. See id. at 680-681 (3).

to the adoption of constitutional language by the people.[7] Only the

language adopted is a reliable indicator of the intention of those who

adopted it. See, e.g., *Olevik v. State*, 302 Ga. 228, 236 (2) (c) (i) (806

---

[7] As we noted in *Olevik v. State*:

Our objective focus is even more important when we interpret the Constitution. Unlike ordinary legislation, the people — not merely elected legislators — are the "makers" of the Georgia Constitution. See Ga. Const. of 1983, Art. X, Sec. I, Par. II (proposals to amend or replace constitution require a vote of the people); see also *Wheeler v. Bd. of Trustees of Fargo Consolidated School Dist.*, 200 Ga. 323, 333 (3) (37 SE2d 322) (1946) ("The fiat of the people, and only the fiat of the people, can breathe life into a constitution."). If the subjective intent of one legislator out of 236 casts little light on the meaning of ordinary legislation, such subjective views can hardly carry more weight for a Constitution that had hundreds of thousands of citizens who voted on its ratification. See Ga. L. 1983, p. 2070 (1983 Constitution ratified with 567,663 yes votes and 211,342 no votes). That said, considering what the framers of our Constitution understood the words they selected to mean can be a useful data point in determining what the words meant to the public at large. See *Gwinnett County School Dist. v. Cox*, 289 Ga. 265, 307-308 (710 SE2d 773) (2011) (Nahmias, J., dissenting) ("In construing our Constitution, we . . . sometimes look to the understanding expressed by people directly involved in drafting the document. . . . The best evidence [of their intent], of course, is not what various framers said to each other at various points during the process, but what they ultimately drafted together — the actual Constitution that the citizens of Georgia then ratified.").

302 Ga. 228, 238-239 (806 SE2d 505) (2017).

SE2d 505) (2017) ("[T]he text is always our starting point for determining original public meaning [of a constitutional provision] (and often our ending point, as well)[.]"); *Lathrop v. Deal*, 301 Ga. 408, 429 (III) (B) (801 SE2d 867) (2017) (reasoning that the plain and natural meaning governs because "[c]onstitutions are the result of popular will" (citation and punctuation omitted)).

Without regard to what the committee members might have thought or believed about the language they included for the consideration of the people of Georgia, the people themselves elected to be governed by the actual language *in* the 1983 Constitution. Moreover, were we to employ ordinary canons of construction to the interpretation of the language of the 1983 Constitution, we would be wise to start first with a consideration of a change from preexisting language before endeavoring to divine intent from committee proceedings. See *Jones v. Peach Trader Inc.*, 302 Ga. 504, 514 (III) (807 SE2d 840) (2017) ("[C]hanges in statutory language generally

22

indicate an intent to change the meaning of the statute." (citation and punctuation omitted)); *Bishop v. State*, 341 Ga. App. 590, 593 (802 SE2d 39) (2017) (Bethel, J., concurring) ("Any attempt to discern legislative intent beyond the express language passed by a legislative body is as practical and productive as attempting to nail Jell-O to the wall."). See also *Elliott v. State*, 305 Ga. 179, 208-209 (III) (C) (ii) (824 SE2d 265) (2019) (referencing a meeting of Subcommittee on Rights of Persons wherein Justice Bowles noted in reference to constitutional drafting that "change should be made where change is necessary but" courts view a change in words as "an intention on the part of the framers to give it a different meaning from the meaning that theretofore existed" (citation and punctuation omitted)). And here, as mentioned above, the change in language carries clear meaning that is readily distinguishable from the language employed in the prior Constitutions. See *Weatherbed*, 271 Ga. at 739 (Benham, C. J., concurring specially) (noting that

23

"[f]rom the addition of new language [to the 1983 Constitution regarding this Court's jurisdiction], we presume that some change in the existing law was intended").

Moreover, the *Neal* concurrence ignores the fact that the language of the 1983 Constitution draws a distinction between two classes of cases over which this Court has jurisdiction: cases in which the death penalty was imposed *or* could be imposed. *Neal* clearly determined that the "could be imposed" language was sufficient to give this Court jurisdiction over essentially every appeal arising from a case that includes a murder charge. But in doing so, its interpretation renders the words "was imposed" (and the distinction between the two types of cases) meaningless and completely superfluous. That reading of the 1983 Constitution thus runs afoul of this Court's routine admonition that "courts generally should avoid a construction that makes some language mere surplusage." *Middleton v. State*, 309 Ga. 337, 342 (3) (846 SE2d 73)

24

(2020) (citation and punctuation omitted). That canon of statutory construction applies with at least equal force in the constitutional context. And reading words into or out of the Constitution is a power reserved exclusively to the people through the amendment process.

Although I see significant problems with the rationale relied upon in the *Neal* concurrence, I am persuaded by then-Justice Nahmias's suggestion in his dissent in *Murray* that this Court is empowered to assert discretionary jurisdiction over murder (and any other) cases based on our expansive power of certiorari. See *Murray*, 286 Ga. at 266-272 (2) (b) (Nahmias, J., dissenting). Thus, I am not compelled to dissent in this case based on a belief that we have considered this case or thousands of other murder cases since 1983 without legal authority or that the State's motion to transfer this case to the Court of Appeals must be granted. Rather, I am convinced we exercise jurisdiction in these cases solely as a discretionary matter. But I am not entirely certain we should.

25

The Court of Appeals, which ordinarily sits in three-judge panels, considers scores of felony convictions and life sentences annually. Further, it has a history of producing non-precedential opinions. In short, the Court of Appeals is a proven, efficient, responsible intermediate appellate court with exceptionally broad jurisdiction. Deciding non-capital direct appeals arising from murder convictions is clearly within the capacity of the members of that court. And certiorari review by this Court would remain available for any murder case presenting an issue of "great concern, gravity, or importance to the public." Supreme Court Rule 40.

This Court, by contrast, always sits as a whole court and does not issue non-precedential opinions. Thus, under the current state of affairs, the amount of state appellate judicial resources dedicated in a direct appeal of a murder conviction where the sentence of life in prison with a possibility of parole was imposed is likely greater than those dedicated to a serial sex offender sentenced to multiple

26

life sentences without the possibility of parole.[8] Even with the admittedly tragic reality involving the loss of human life, I am not certain that all the legal issues raised in murder cases we hear constitute matters of "great concern, gravity, or importance to the public" of the sort that warrants a fast-track to this Court. All manner of human depravity, personal and family loss and tragedy, and cases that capture public attention fail to qualify when a petition for a writ of certiorari is considered by this Court. I believe the same to be true of most non-capital murder cases and see no logical reason to maintain a built-in bypass for these cases. Thus, to

---

[8] To partially understand the significance of the impact of sitting in divisions versus sitting exclusively as a whole court, consider a hypothetical term in which 45 murder appeals reach the appellate docket. Under this Court's structure and practice and assuming a normal, balanced distribution, each Justice would be tasked with authoring five such opinions while participating and voting on the remaining 40 cases. By contrast, assuming a normal distribution of those same 45 cases across five three-judge panels of the Court of Appeals, each panel would receive nine such cases. Thus, excluding any allowance for the typically small number of cases that move to consideration by the whole court, each judge would author three opinions and participate and vote in only six more.

the extent our discretionary authority is being used to exercise jurisdiction in non-capital murder cases, I think the time has come to reconsider.

In doing so, I am mindful that following the clear language of the 1983 Constitution with respect to direct appeals would have a significant practical impact on the operations of this Court and the Court of Appeals. Responsible resource stewardship would almost certainly require an analysis of the impact on the Court of Appeals. That question and whether any net taxpayer savings could be realized should be a matter of discussion with the Court of Appeals and the General Assembly. This is a discussion that may take time. But, that is no reason not to have it.

Decided September 7, 2022.

Murder. Cherokee Superior Court. Before Judge Cannon.

*Debra K. Jefferson*, for appellant.

*Shannon G. Wallace, District Attorney, Cliff Head, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.

29