NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 24, 2025

S25A0136.  HART v. THE STATE.

MCMILLIAN, Justice.

Danielle Hart appeals her malice murder conviction for the beating death of her four-year-old daughter, Jamila Hart.[1] As an initial matter, the State, through the Office of the Attorney General,

---

[1] Jamila died on August 24, 2014. In September 2016, a Clayton County grand jury indicted Hart for malice murder (Count 1), five counts of felony murder (Counts 2, 4, 6, 8, and 10), two counts of cruelty to children in the first degree (Counts 3 and 5), aggravated assault (Count 7), aggravated battery (Count 9), false imprisonment (Count 11), tampering with evidence (Count 12), cruelty to children in the third degree (Counts 13-14), and aggravated sexual battery (Count 15). Following a jury trial held from January 23 to 26, 2017, Hart was found guilty of all counts except for tampering with evidence (Count 12) and aggravated sexual battery (Count 15). On February 20, 2017, the trial court sentenced Hart to serve life in prison without the possibility of parole for malice murder (Count 1) and 12 months for each count of cruelty to children in the third degree (Counts 13-14), with each sentence to run consecutive to Count 1; Counts 2-11 were either vacated by operation of law or merged for sentencing purposes. Hart timely filed a motion for new trial, which was amended through new counsel on March 9, 2020, April 26, 2022, and February 1, 2023. Following a hearing in June 2023, the trial court denied the motion for new trial, as amended, on April 11, 2024. Hart timely appealed, her case was docketed to the term of this Court beginning in December 2024, and the case was orally argued on January 14, 2025.

questions whether this Court should continue exercising direct appellate jurisdiction over murder cases where the death penalty has not been sought and requests that we transfer the case to the Court of Appeals. We deny the State's request to transfer this case for the reasons set out below.

Turning to the merits, Hart argues that (1) the evidence was insufficient to support her conviction as a matter of federal due process; (2) her trial counsel rendered constitutionally ineffective assistance by not impeaching two witnesses and by not introducing two video recordings into evidence; (3) the trial court erred in failing to instruct the jury on confession corroboration; (4) the State failed to correct testimony it knew to be false; and (5) the cumulative harm from these errors requires a new trial. Because we conclude that the evidence was sufficient to sustain her convictions, that trial counsel did not render constitutionally ineffective assistance, that the trial court did not commit plain error in failing to instruct on confession corroboration, and that Hart's remaining enumerations of error are without merit, we affirm.

The evidence presented at trial showed that Jamila lived with Hart, Jamila's two younger sisters, and Hart's girlfriend, Shardea Glover in the River Ridge Apartments in Clayton County. Around 1:30 p.m. on August 24, 2014, William and Tori Johnson, who lived in the apartment complex across the hall from Hart and Glover, heard banging on their front door. When they opened the door, Glover was screaming, "[M]y child's not breathing, my child's not breathing." They followed Glover into her apartment and found Jamila "laid out on the bed" in the back bedroom. Glover pulled down Jamila's pants and said, "You don't understand, I spanked her, I spanked her, you don't understand. . . . I lost control." The Johnsons determined that Jamila was not breathing and began performing CPR until EMS arrived. Jamila was then immediately transported to a nearby hospital but did not survive her injuries.

Tori testified that Jamila's body was cold when she and her husband found her in the bedroom and that there was vomit in Jamila's mouth and on the bedspread where she was lying. Jamila also had "a big knot on her forehead" and "whelps on her backside"

3

that were "open and bleeding." Hart was in the bedroom, "whooping and hollering, making a whole lot of noise, [saying] my baby, my baby." But Tori noticed that "[t]here were no tears." Tori heard Glover say, "We're going to jail, we're going to jail." Tori also testified that she had witnessed Hart discipline Jamila several times by forcing her to stand still with her arms out or to stand on one leg for up to 20 minutes at a time. Hart had told Tori that she had to be "strict" with Jamila because Jamila was "stubborn."

AyAsia Cherry, who was a nursing student at the time, also lived nearby and assisted with performing CPR on Jamila. According to Cherry, Hart told her that Jamila "had choked." However, as Cherry was performing CPR on Jamila, additional vomit was forced into Jamila's mouth, and Cherry noticed that the vomit was cold, which she would not have expected if Jamila had just recently choked. After Glover pulled Jamila's pants down, Cherry saw "blood marks on [Jamila's] legs." Cherry did not see Hart crying at any point, and when she saw Hart later that afternoon, Hart was "sitting in the breeze way[,] . . . drinking a cup of beer and

4

smoking a cigarette" and "did not look upset at all."

Freddie Johnson, another neighbor, testified that he brought his daughter to Hart's apartment earlier that day so that Hart could braid his daughter's hair. About 20 minutes later, Hart brought his daughter back and said she could not finish her hair because her own daughter was sick. Freddie testified that when he had seen Jamila in the past, she had "acted scared" and "didn't seem happy at all."

Dr. Richard Sobel, an emergency room physician, testified that Jamila had already died by the time she presented to the hospital and that "she had been dead for some time," as evidenced by the complete lack of cardiac or brain activity. Dr. Sobel then explained the extent of Jamila's injuries, including swelling and bruising on her forehead from an apparent blunt-force injury, bruising and swelling of her left eye, and a large black and blue mark on her abdomen that he opined was "not fresh" and was consistent with blunt-force trauma. Jamila's arms had linear abrasions that were commonly seen with a "fingernail type" injury inflicted from being

held, and her entire buttocks area was "massively swollen" with a breakdown of tissue and leakage of fluid. Her legs were "riddled with bruising" and "swollen to the point where tissue fluid is almost just bursting out of the swollen leg." Based on his examination, it was difficult "to find parts that [were] probably not bruised." He opined that the injuries would have been "grossly painful" and that Jamila "was tortured."

Dr. Sobel explained that Jamila's injuries had likely been maturing or evolving for hours before she arrived at the emergency room. As she succumbed to her injuries, someone present would have seen Jamila experience anxiety, sweating, pale skin, rapid breathing, and then eventually a cessation of breathing, a process that would "take quite some time." In his opinion, because the "dependent area," particularly her buttocks, was so swollen, it was likely that Jamila was on her back for a while, helpless, as the swelling continued until she died an "excruciating death."

Dr. Lora Darrisaw, the medical examiner who performed the autopsy on Jamila, identified 20 injuries on Jamila's head and neck,

including a fractured clavicle, 20 injuries on her torso, 21 injuries to her arms, and 23 injuries to her legs. Dr. Darrisaw opined that the majority of the injuries were consistent with blunt-force trauma. Some of the injuries, including the fractured clavicle and curved linear abrasions, were consistent with Jamila having been restrained by her arms. Dr. Darrisaw concluded that the internal bleeding was so extensive that it caused a disruption of the normal function of Jamila's heart and brain and ultimately caused Jamila's death; she did not identify any other natural disease process that would have contributed to Jamila's death.

The State also presented the testimony of Carie Daughtry. Daughtry testified that she and Hart frequently talked while they were in jail together in the fall of 2014. One day Hart told Daughtry that her daughters, Jamila and Janet had been arguing and that Glover had offered to punish Jamila for lying about the argument. Hart told Glover to give Jamila "[f]our licks" and then "four minutes in the corner." While Hart went outside to smoke, Jamila went with Glover. When Hart came back inside, she found Glover and Jamila

7

in the bathroom before Glover took Jamila to the bedroom.

At that point, Hart held Jamila's arms over her head while Jamila was bent over the bed so that Jamila could not move, and Glover repeatedly beat Jamila with a piece of wood. Daughtry stepped down from the stand to demonstrate to the jury what Hart had described. Hart told Daughtry that Jamila was crying and yelling while she was hit, but that Hart never asked Glover to stop even though Glover "lost it." Hart did not let go of Jamila until Jamila stopped yelling and crying. Glover continued to hit Jamila with the wooden board until "[t]he board broke."

Afterwards, Hart put Jamila on the bed and rubbed ointment on her back, but Jamila remained passed out. Hart left Jamila there and then started doing her neighbor's hair. When Hart returned to the bedroom to see if Jamila would eat some soup she had made, Glover was in there and told her that Jamila was not breathing. Before calling 911, Hart and Glover took the broken board outside to the trash.

Hart called Glover to testify in her defense at trial. Glover

admitted that she was serving a life sentence in Pulaski State Prison after pleading guilty to Jamila's murder. However, Glover testified that she only gave one spanking to Jamila that day and that she was "in distress, in shock at the time" and did not recall telling officers that she spanked Jamila three times over an hour and a half.

1. We begin by addressing the State's request, through the Office of the Attorney General, that this Court reconsider its jurisdiction over murder cases in which the death penalty was not sought. Specifically, the State argues that this case should be transferred to the Court of Appeals because the Georgia Constitution limits this Court's direct appellate jurisdiction to murder cases in which the death sentence has been imposed or could be imposed, see Ga. Const. of 1983, Art. VI, Sec. VI, Par. III (8) ("Paragraph III (8)"),[2] and for policy reasons, this Court should not exercise its certiorari jurisdiction to take these cases on direct

---

[2] This provision reads, in relevant part, "[u]nless otherwise provided by law, the Supreme Court shall have appellate jurisdiction of . . . [a]ll cases in which a sentence of death was imposed or could be imposed." Ga. Const. of 1983, Art. VI, Sec. VI, Par. III (8).

appeal.

Turning to the legal and historical context of Paragraph III (8), which we have previously interpreted and need not construe anew, this Court has long exercised jurisdiction over all cases in which the appellant has been found guilty of murder. Before 1983, the Georgia Constitution gave us jurisdiction over "all cases of conviction of a capital felony." Ga. Const. of 1976, Art. VI, Sec. II, Par. IV; Ga. Const. of 1945, Art. VI, Sec. II, Par. IV. In other words, our appellate jurisdiction turned on the statutory penalties for the crime of conviction, not anything specific about the particular case.[3]

But the 1983 Constitution removed the reference to "capital felony" and replaced it with "cases in which a sentence of death was imposed or could be imposed." Ga. Const. of 1983, Art. VI, Sec. VI, Par. III (8). The next year, we had the opportunity to determine

---

[3] This Court construed the term "capital felony" as describing the class of "'felonies to which the death penalty is affixed as a punishment under given circumstances'" as opposed to felonies "'in which under no circumstances would death ever be inflicted as a penalty.'" *Collins v. State*, 239 Ga. 400, 402 (2) (236 SE2d 759) (1977) (quoting *Caesar v. State*, 127 Ga. 710, 712 (1) (57 SE 66) (1906)).

whether this Court had direct appellate jurisdiction over an appeal of a murder case in which the death penalty was not sought. See *State v. Thornton*, 253 Ga. 524, 524 (1) (322 SE2d 711) (1984). There, we noted that the 1983 Constitution's change in text meant that we no longer had jurisdiction over non-death-penalty murder cases because the "district attorney did not give timely notice to the defense that the state intended to seek the death penalty." Id. However, we decided "[a]s a matter of policy" that this Court would nevertheless continue to exercise its jurisdiction to review "all murder cases." Id. Accordingly, we ordered the Court of Appeals to transfer to us all such appeals docketed after December 1, 1984, thereby maintaining the pre-1983 status quo.[4] See id.

Ten years later, this Court had another opportunity to

---

[4] The transfer order read:

The Court of Appeals is directed to transfer to the Supreme Court all cases in which either a sentence of death or of life imprisonment has been imposed upon conviction of murder, and all pre-conviction appeals in murder cases, whether or not timely notice was given by the district attorney as required by Unified Appeal § II. A. 1., 246 Ga. at A–7. This order shall be effective as to cases docketed in the Court of Appeals after December 1, 1984.

*Thornton*, 253 Ga. at 524 (1).

determine whether the Court of Appeals or this Court has direct appellate jurisdiction over non-death-penalty murder cases under Paragraph III (8). Despite the *Thornton* transfer order, in *Rhyne v. State*, 264 Ga. 176 (442 SE2d 742) (1994), the Court of Appeals retained and decided an appeal from a non-capital murder where the jury had been unable to reach a verdict and a mistrial was declared. This Court concluded that although the Court of Appeals should have transferred the case under *Thornton*, the court "did not lack jurisdiction to consider the merits of appellant's former appeal" because the case was not one "in which a sentence of death was imposed or could be imposed." Id. at 177 (punctuation omitted; citing Paragraph III (8)).

Over the years, our jurisdiction over non-death-penalty murder cases pursuant to *Thornton* and its order to transfer all murder appeals "as a matter of policy" has been questioned. In *Weatherbed v. State*, 271 Ga. 736, 739 (524 SE2d 452) (1999) (Benham, CJ, concurring specially), Chief Justice Benham called on the Court to "comply with the change in its appellate jurisdiction in non-capital

murder cases brought about by passage of the 1983 Georgia Constitution," as recognized in *Thornton*, and to have all future murder appeals decided by the Court of Appeals in the first instance. He argued that the 1983 Constitution had limited the Court's jurisdiction to "cases in which a defendant has been sentenced to death," cases "in which the possibility of the imposition of the death penalty still exists," death penalty cases at the "interim review phase," and "interlocutory appeals arising in cases where the defendant has been charged with a crime punishable by death" if the death penalty could still be pursued by the State at the time of the appeal. Id. at 740.

Despite Chief Justice Benham's concerns, we did not review our jurisdiction under *Thornton* again for a decade. In 2009, we concluded that this Court has direct appellate jurisdiction over an appeal from a contempt order issued against an assistant district attorney in a murder prosecution because, pursuant to *Thornton*'s transfer order, "the proper focus is on the nature of the underlying action. If the underlying action is a murder case, this Court has

jurisdiction of the appeal, regardless of whether the order being appealed is based on facts having some bearing on the underlying criminal trial." *State v. Murray*, 286 Ga. 258, 258-59 (1) (687 SE2d 790) (2009) (cleaned up). Justice Nahmias dissented, seeking to offer a better explanation than "as a matter of policy" for our order that the Court of Appeals must transfer all murder appeals to this Court. He suggested that the Court's "almost-unlimited *certiorari* jurisdiction" authorized us to take murder cases from the Court of Appeals. Id. at 266 (2) (b) (emphasis in original).

Yet, just a few years later, the members of the Court seemed to reject *Thornton*. In 2012, all of the Justices joined a concurring opinion authored by Chief Justice Hunstein stating for the first time that the 1983 change in constitutional text made no difference in meaning, and so our post-1983 jurisdiction remained the same as it was under the previous constitutional language. See *Neal v. State*, 290 Ga. 563, 567-72 (722 SE2d 765) (2012) (Hunstein, CJ, concurring) ("the *Neal* concurring opinion"). The Court reasoned that "the constitutional history of the 1983 Constitution makes clear

14

that the framers intended for the division of jurisdiction between the two appellate courts to remain unchanged." Id. at 570 (citing various transcripts from 1977-1981 committee meetings related to Article VI).[5] Chief Justice Hunstein explained that "this Court should interpret our State Constitution as giving us jurisdiction over life-imprisonment murder convictions, thus making unnecessary the transfer order adopted in *Thornton*." Id. at 572. And she concluded that "[f]or these reasons, [she] *would* overrule *Thornton* and *Rhyne* to the extent they hold that the 1983 Constitution gives the Court of Appeals jurisdiction over direct appeals in life-imprisonment murder convictions." Id. (emphasis supplied). Despite the concurring opinion's statement of future intention, however, the concurring

---

[5] The *Neal* concurring opinion's reliance on these committee deliberations was misplaced, given the well-documented reasons to distrust legislative history in the adoption of constitutional language by the people:

Unlike ordinary legislation, the people — not merely elected legislators — are the "makers" of the Georgia Constitution. . . . If the subjective intent of one legislator out of 236 casts little light on the meaning of ordinary legislation, such subjective views can hardly carry more weight for a Constitution that had hundreds of thousands of citizens who voted on its ratification.

*Olevik v. State*, 302 Ga. 228, 237-38 (2) (c) (i) (806 SE2d 505) (2017).

opinion did not purport to overrule *Thornton* and *Rhyne*;[6] *Neal*'s main opinion did not address this Court's jurisdiction; and no other case has since overruled *Thornton* and *Rhyne*. Thus, even though all Justices then sitting on the Court joined in the *Neal* concurring opinion, which said that the concurring Justices "would overrule" *Thornton* and *Rhyne*, they did not actually overrule either decision, and both decisions remain binding precedent.

In more recent years, Justice Bethel authored a concurring opinion that again questioned the nature of this Court's jurisdiction over murder cases. See *Garcia-Jarquin v. State*, 314 Ga. 555, 557-65 (878 SE2d 200) (2022) (Bethel, J, concurring). Echoing Chief Justice Benham's special concurring opinion in *Weatherbed*, Justice Bethel wrote that the plain language of the 1983 Constitution

---

[6] We question whether a concurring opinion, denominated as such, is binding precedent, even if a majority of Justices join it, since a concurring opinion is defined as fully supporting the judgment of the main opinion. See Supreme Court Rule 58 ("When a Justice concurs, he or she agrees with the opinion . . . and the judgment rendered by it."); former Supreme Court Rule 58 ("When a Justice concurs, he or she agrees with the opinion and judgment of . . . the opinion."). However, we need not decide this issue because the *Neal* concurring opinion stated only a future intention to overrule *Thornton* and *Rhyne*.

16

"limited our jurisdiction over appeals in murder cases to only those cases in which, at the time of the appeal, a sentence of death has been imposed, cases where the State is actively seeking the death penalty, and cases where a possibility remains that the State could seek the death penalty." Id. at 558. Justice Bethel also noted that he was persuaded by Justice Nahmias's suggestion in his dissenting opinion in *Murray* – "that this Court is empowered to assert discretionary jurisdiction over murder (and any other) cases based on our expansive power of *certiorari*" – and set out reasons for why this Court ought not exercise its jurisdiction over non-death-penalty murder cases, including the capacity of the Court of Appeals to efficiently handle these cases. Id. at 564-65.

Against this backdrop, we remain convinced that *Thornton* correctly concluded that the change of text in the 1983 Constitution meant that this Court no longer had jurisdiction over non-death-penalty murder cases and that the *Neal* concurring opinion's conclusion to the contrary is insupportable. Chief Justice Benham's concurring opinion in *Weatherbed* provided the textual analysis

supporting *Thornton*'s conclusion. See *Weatherbed*, 271 Ga. at 740-41 (Benham, CJ, concurring). The *Neal* concurring opinion, on the other hand, failed to properly engage with the text or apply long-standing canons of construction. See *Middleton v. State*, 309 Ga. 337, 345 (3) (846 SE2d 73) (2020) (It is "a core principle of statutory interpretation that changes in statutory language generally indicate an intent to change the meaning of the statute."); *Barrow v. Raffensperger*, 308 Ga. 660, 672 (3) (c) (842 SE2d 884) (2020) ("When constitutional language is substantively changed, we must give that change effect."); *Olevik v. State*, 302 Ga. 228, 236 (2) (c) (i) (2017) (in interpreting a constitutional provision, "the text is always our starting point . . . (and often our ending point, as well)," with "the broader context in which that text was enacted" also serving as a "critical consideration"). In particular, although the 1983 Constitution provides that this Court has general appellate jurisdiction in "classes of cases"[7] in which a sentence of death "was

---

[7] The special concurring opinion places more analytical weight on Paragraph III's "classes of cases" language than it can support. That language

18

imposed or could be imposed," the *Neal* concurring opinion

concluded that this Court has jurisdiction of cases in every murder

case, whether or not a sentence of death was ever sought or imposed.

This interpretation renders the "was imposed" language complete

surplusage because the *Neal* concurring opinion's construction of

"could be imposed" itself would cover every murder case.[8] Thus, we

does not indicate that we should not look to the specific facts and posture of a case to determine whether it is in one of the relevant classes; indeed, that is what we have done for decades for other itemized classes. See, e.g., *Williford v. Brown*, 299 Ga. 15, 16 (2) (785 SE2d 864) (2016) (whether an action was an equity case under this Court's previous jurisdiction depended on the issue raised by the parties on appeal; "[c]ases in which the grant or denial of [equitable relief] was merely ancillary to underlying issues of law, or would have been a matter of routine once the underlying issues of law were resolved, are not equity cases") (cleaned up); *Arrington v. Reynolds*, 274 Ga. 114, 114 (549 SE2d 401) (2001) (case did not fall within Court's previous title to land jurisdiction because "plaintiffs do not dispute defendant's record ownership of the property—they simply seek to set aside the deed based on improper notice of the foreclosure proceedings"); *In re Estate of Lott*, 251 Ga. 461, 461 (306 SE2d 920) (1983) ("We hold that the language 'all cases involving wills' [in the 1983 Constitution] means those cases in which the will's validity or meaning is in question."). And the special concurring opinion's reliance on *Ferguson v. Composite State Bd. of Med. Examiners*, 275 Ga. 255 (564 SE2d 715) (2002), is misplaced. In that case, this Court addressed whether the direct appellate procedures of OCGA § 5-6-34 or the discretionary application procedures of OCGA § 5-6-35 controlled in the context of a trial court issuing a mandamus concerning a subject matter that was covered under the discretionary appeal statute. See id. at 256-57 (1). That analysis is simply not germane to the question of the scope of our appellate jurisdiction under Paragraph III (8).

[8] In the same way, the construction offered in the special concurring opinion renders the "was imposed" language surplusage. Even more critically,

conclude that *Thornton* correctly held that a murder case in which

the district attorney has not given timely notice to the defense that

the State intends to seek the death penalty is not a case "in which a

sentence of death was imposed or could be imposed."[9] See Paragraph

although the special concurring opinion acknowledges that the 1983 Constitution's language shifts the focus away from the crime and to the actual or potential punishment, it asserts that the new language essentially focuses on the same thing – "the nature of the underlying offense and its associated punishments." Spec. Conc. Op. at 12-13.

[9] In a handful of our cases decided after *Neal*, we indicated that we had jurisdiction over a case and cited the *Neal* concurring opinion in support. As we have just explained, however, that concurring opinion did not overrule *Thornton* or hold that our jurisdiction in the set of murder cases in which a death sentence actually could no longer be imposed was in fact derived from Paragraph III (8). We need not overrule those decisions on that point because they were correct that we had jurisdiction over those cases under *Thornton's* policy. But to the extent that the language of those decisions suggests that our jurisdiction over those cases came from Paragraph III (8) instead, that language is disapproved. See, e.g., *Garcia-Jarquin v. State*, 314 Ga. 555, 555 n.1 (878 SE2d 200) (2022) (explaining that we denied the State's motion to transfer the case to the Court of Appeals because the aggravated assault charge "was brought under the same indictment as the murder charge, and was obtained in the same trial as the murder conviction"); *Brock v. Hardman*, 303 Ga. 729, 729 (814 SE2d 736) (2018) ("We conclude that this appeal arises from an extraordinary remedies case 'concerning proceedings in which a sentence of death was imposed or could be imposed,' and thus we have jurisdiction under OCGA § 15-3-3.1 (a) (4)."); *Henderson v. State*, 303 Ga. 241, 244 (1) (811 SE2d 388) (2018) (concluding that we had subject matter jurisdiction over the appeal of a denial of a post-conviction motion requesting disclosure of grand jury testimony in a murder case "because the appeal arises from a case 'in which a sentence of death was imposed or could be imposed' under Ga. Const. Art. VI, Sec. VI, Par. III (8)"); *WXIA-TV v. State*, 303 Ga. 428, 432 (1) n.5 (811 SE2d 378) (2018) (concluding that we had subject matter

III (8).

In requesting that we transfer this case to the Court of Appeals, the State, through the Office of the Attorney General, raises various policy reasons that counsel against the continued exercise of this Court's certiorari jurisdiction over all non-death-penalty murder appeals in the first instance. We acknowledge that non-death-penalty murder appeals make up a large percentage of this Court's caseload and that the Court of Appeals is well suited to handle such cases, especially given the Court of Appeals's increased size and scope since the time of the *Thornton* transfer order. We also acknowledge that, were we to retreat from the ruling this Court announced in *Thornton*, certiorari review by this Court would remain available for murder cases in the same way that it is available for other cases. See S. Ct. R. 40; Ga. Const. of 1983, Art. VI, Sec. VI, Par. V. And we are mindful that, if we were to take that

_____

jurisdiction over an appeal from a collateral order in a murder case that restrained participants in the case from making extrajudicial, public statements).

21

step, we would have increased capacity to focus on legal questions with a broader application instead of many of the fact-bound issues that we currently consider.

However, notwithstanding the merits of the policy considerations advanced by the State, other competing policy considerations are at issue as well. Stakeholders in Georgia have for decades relied on the current state of affairs. For example, both staffing decisions and numerous procedures of the Court of Appeals and Supreme Court are based on this Court's exclusive review of non-death-penalty murder appeals – such that it would be difficult to retreat from the *Thornton* transfer order without proper planning and coordination. See *Garcia-Jarquin*, 314 Ga. at 565 (Bethel, J, concurring) (recognizing the "significant practical impact on the operations of this Court and the Court of Appeals" if non-death-penalty murder cases were appealed to the Court of Appeals in the first instance). Accordingly, we decline to retreat from *Thornton*'s transfer order at this time, which is best understood as reflecting a decision to retain jurisdiction over this and other non-death-penalty

murder appeals pursuant to our certiorari jurisdiction. See *Murray*, 286 Ga. at 266 (2) (b) (Nahmias, J, dissenting) (explaining that "we may properly take all murder appeals as a categorical exercise of our longstanding and almost-unlimited *certiorari* jurisdiction" (emphasis in original)).

2. Turning to the merits of this appeal, Hart first asserts that the State failed to adduce sufficient evidence that she had either express or implied malice to sustain her conviction for malice murder as a matter of constitutional due process and under state statutory law. Specifically, she argues that the State failed to present evidence from which the jury could have inferred malice and that the only evidence she intentionally participated as a party to the crime came from Daughtry's testimony, which Hart contends was not corroborated in violation of OCGA § 24-8-823 ("All admissions shall be scanned with care, and confessions of guilt shall be received with great caution. A confession alone, uncorroborated by any other evidence, shall not justify a conviction.").

When assessing the sufficiency of the evidence as a matter of

23

constitutional due process, we view the evidence in the light most favorable to the verdict and consider whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crime for which she was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). In doing so, "we put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the jury." *Blocker v. State*, 316 Ga. 568, 574 (2) (889 SE2d 824) (2023) (citations and punctuation omitted).

So viewed, we conclude that the evidence was sufficient to support Hart's conviction for malice murder as a party to the crime. See OCGA § 16-2-20 (a person may be convicted as a party to the crime if she "[i]ntentionally aids or abets in the commission of the crime" or "[i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime"). In addition to Hart's incriminating statements to Daughtry, the testimony from multiple witnesses showed that Hart was present in the apartment while her

24

daughter was brutally beaten over a significant period of time and eventually died from her injuries, that Hart gave an inconsistent statement to one neighbor about Jamila being "sick," that Hart lied about Jamila "choking," and that Hart failed to seek aid for Jamila's injuries. See *Walker v. State*, 308 Ga. 33, 35-36 (1) (838 SE2d 792) (2020) (evidence sufficient to sustain conviction for malice murder where child sustained numerous injuries in days leading up to her death while living with defendant, the injuries were not consistent with defendant's explanations, and defendant made an incriminating statement); *Debelbot v. State*, 305 Ga. 534, 538 (1) (826 SE2d 129) (2019) (although evidence was circumstantial as to which parent committed the crimes, it was legally sufficient to support both the mother and father's convictions for the malice murder of their infant as a party to the crimes).

To the extent Hart argues lack of sufficiency as a matter of Georgia statutory law for failure to corroborate her confession to Daughtry under OCGA § 24-8-823, this argument fails. We are skeptical that Hart's statements to Daughtry constituted a

confession rather than admissions, but even assuming that they are, her statements were corroborated by other evidence, including testimony from multiple witnesses that Hart was present in the apartment when Jamila was found dead, that Jamila's injuries were severe and inflicted over a period of time that Hart was present in the apartment, and Hart's false explanation at the scene that Jamila had choked. See *Baker v. State*, 319 Ga. 456, 460-61 (1) (902 SE2d 645) (2024) (appellant's alleged confession was sufficiently corroborated by evidence, including circumstances under which the victims were discovered and evidence of appellant's consciousness of guilt); *Hooper v. State*, 313 Ga. 451, 455-56 (1) (870 SE2d 391) (2022) ("[N]o specific manner of corroboration of the confession is required, and corroboration in any particular is sufficient." (citation and punctation omitted)); *McMullen v. State*, 300 Ga. 173, 174 (1) (794 SE2d 118) (2016) ("An admission differs from a confession in that a confession acknowledges all of the essential elements of the crime." (citation and punctuation omitted)).

3. Hart also raises several claims of ineffective assistance of

counsel. To succeed on these claims, Hart must prove both that her counsel's performance was deficient and that the deficient performance prejudiced her. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To show deficient performance, Hart must demonstrate that her counsel performed "in an objectively unreasonable way, considering all of the circumstances and in the light of prevailing professional norms." *Troutman v. State*, 320 Ga. 489, 494 (3) (910 SE2d 173) (2024) (citation and punctuation omitted). As to the prejudice prong, Hart "must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." Id. (citation and punctuation omitted). "This burden, though not impossible to carry, is a heavy one." *Hayes v. State*, 320 Ga. 505, 514 (3) (910 SE2d 198) (2024) (citation and punctuation omitted). If a defendant fails to establish either one of these two prongs, we need not examine the other. See *Summerville v. State*, 320 Ga. 60, 61 (2) (907 SE2d 604) (2024).

(a) Hart first asserts that trial counsel performed deficiently

27

when she failed to impeach Glover's testimony that Glover only spanked Jamila one time and "never admitted to the crime of murder." Hart argues that trial counsel should have impeached this testimony with Glover's final disposition following her plea agreement and certain of Glover's pretrial statements to detectives, including that she could not say how many times she had spanked Jamila, but each time was ten to fifteen seconds; that after the first "butt-whooping" Glover's hands were so swollen that she switched to a paddle; that her goal was to hit Jamila four to five times per spanking; and that Jamila fell and bumped her head during the second beating. Hart also argues that trial counsel should have impeached Glover's testimony with a separate recorded statement, in which Glover told Hart, "This is me. Everything. This is me. I did it. . . . I took your daughter's life. . . . I killed a kid. . . . I know I took your baby. . . .  This is my fault. . . . I'm taking responsibility for every bruise, scratch, bump. Anything that kid has, that's me." We are not persuaded.

"Generally, a matter of reasonable trial strategy and tactics

does not constitute ineffective assistance of counsel, and hindsight has no place in an assessment of the performance of trial counsel." *Bryant v. State*, 306 Ga. 687, 697 (2) (c) (832 SE2d 826) (2019) (citation and punctuation omitted). And "[t]he decision whether to impeach a witness is a matter of trial strategy that typically will not support a claim of ineffective assistance." *Dinkins v. State*, 300 Ga. 713, 716 (4) (b) (797 SE2d 858) (2017) (citation and punctuation omitted).

We first note that, despite Hart's characterization that Glover never admitted to the murder, Glover did admit at trial that she was serving a life sentence in prison after pleading guilty to Jamila's murder. And many of the statements Hart argues should have been used to impeach Glover's testimony were consistent with portions of Daughtry's testimony, including that Glover repeatedly beat Jamila with a piece of wood; that Glover "lost it"; and that Glover continued to hit Jamila with the wooden board until "[t]he board broke." Thus, it was a reasonable trial strategy to allow Glover to testify, without objection, to Glover's abuse of Jamila because counsel could use that

testimony and portions of Daughtry's testimony in an attempt to show that Glover, rather than Hart, was responsible for the murder.

In addition, the record shows that Glover was an unpredictable and hostile witness who could have easily caused harm to Hart's case by implicating Hart in the murder had trial counsel attempted to impeach her testimony. Before Glover was called as a witness, the trial court spoke with Glover outside the presence of the jury about her apparent unwillingness to testify. Although Glover reiterated that she did not want to testify, the trial court ordered her to do so because she had already pleaded guilty to the indictment concerning the charges for which Hart was on trial.

At the motion for new trial hearing, trial counsel explained that she was not able to speak with Glover prior to trial and that Glover became a "very, very combative" witness and "was going into areas that [she] did not want her bringing up."[10] When Glover began

---

[10] Trial counsel testified that Hart's and Glover's romantic relationship "carried on even while they were incarcerated," but by the time the trial began, "one of them had gotten a new girlfriend, and the relationship ha[d] been falling apart."

to deviate from her prior statements and downplayed her actions, it became clear to trial counsel that Glover could cause more harm than good, so she "cut her short." Trial counsel was concerned that Glover would recant "her statement to the police that maybe Hart wasn't involved [in the murder]." Under these circumstances, we cannot say that Hart has "overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct." *Wright v. State*, 314 Ga. 355, 357 (877 SE2d 178) (2022) (citation omitted). Accordingly, this claim of ineffective assistance fails. See *Mitchell v. State*, 308 Ga. 1, 9 (2) (e) (838 SE2d 820) (2020) (decision of whether to impeach a witness through introduction of certified copies of prior convictions is a matter of trial strategy); *McDuffie v. State*, 298 Ga. 112, 115-116 (2) (779 SE2d 620) (2015) (appellant failed to demonstrate trial counsel's "strategic decision not to call" a potential witness was "entirely unreasonable" where trial counsel thought potential witness would be "more harmful than helpful" (citation and punctuation omitted)).

(b) In a related claim, Hart asserts that trial counsel performed

31

deficiently by failing to introduce two video recordings of Glover's pretrial statements to detectives in order to impeach Glover's trial testimony and to contradict harmful testimony from Hart's neighbors that Hart did not cry or seem upset following Jamila's death. Again, we are not persuaded.

At the motion for new trial hearing, trial counsel testified that, although she could have played the video recordings, there "was some reason" that she did not want to play them for the jury, but she could not remember the specific reason. She also explained that she did not want to give the State the opportunity to play portions of the recording that were not helpful. Although trial counsel could not recall each reason why she chose not to play the recordings, our review of the record reveals several objective reasons counsel could have chosen to forgo using this evidence. See *Lane v. State*, 312 Ga. 619, 623 (2) (a) (864 SE2d 34) (2021) ("[W]e are not limited in our assessment of the objective reasonableness of lawyer performance to the subjective reasons offered by trial counsel for his conduct." (citation and punctuation omitted)).

In the first recording, Glover, who appeared very emotional during many parts, made numerous statements minimizing the spankings that she gave Jamila. And several times she referenced Hart's role in disciplining Jamila, including that "mommy (Hart) does most of the discipline, but if it gets too bad" Glover will handle it. She also told detectives, "*We* had a belt"; "*We* broke the belt"; "*We* went with the paddle"; and "*We* got a system." Glover also repeatedly referred to Hart's presence that day, noting that Hart would come in and ask if Jamila had eaten; that Glover kept spanking Jamila because Jamila was lying about the fight with her little sister and Hart "really wanted to know what happened [to cause the fight]"; that Glover told Jamila she needed to tell the truth because "Mommy is crying because you're getting a spanking"; and that she and Hart talked about how "we need to stick our ground . . . we need to follow through." Moreover, parts of this recording corroborated Hart's admissions to Daughtry, including that Hart had walked in on Glover in the bathroom with Jamila; that Hart had applied ointment on Jamila; and that Glover had used a wooden slat and

33

thrown it in the trash before officers arrived.

The second recording is of Glover and Hart in a room without any detectives. For most of the recording, Hart is very still and quiet, whereas Glover began loudly crying and vomiting when she walked in and saw Hart. The two women spent most of the recording whispering to each other in an apparent effort to coordinate their stories. Hart told Glover that she told the detectives that she had "whooped her butt four times and . . . put her in the corner and . . . explained to her what she did wrong and why." At one point, Glover said, "I don't know how long you were talking, I took over because I needed to issue a spanking." Then, Glover told Hart, "The second time was when you came back in, she gave me a different story. You remember when you came in. . . . You told me she gave a different story, so I spanked her butt for the different story." Glover repeated, "Like I told the officers, usually we do a little bit and then we give up and I felt like today we needed to push through because I didn't want it to be a recurrent thing."

Hart has not shown that no reasonable attorney would have

decided against the risk of opening the door to the highly incriminating parts of these recordings by introducing them to impeach Glover's testimony. Accordingly, this ineffective assistance claim fails. See *Castillo-Velasquez v. State*, 305 Ga. 644, 651-52 (3) (827 SE2d 257) (2019) (ineffective assistance claim failed where trial counsel correctly recognized that the State could have sought to admit unfavorable portions of the medical records under the rule of completeness had counsel sought to introduce only the favorable portions); *Miller v. State*, 296 Ga. 9, 12 (4) (a) (764 SE2d 823) (2014) (trial counsel's strategic decision not to call a witness that could have opened the door to harmful evidence did not amount to ineffective assistance).

(c) Hart also asserts that her trial counsel performed deficiently by failing to impeach Dr. Sobel's testimony that Jamila was "tortured" by introducing Jamila's medical records from the months preceding her death.

At the motion for new trial hearing, trial counsel testified that she did not believe that there was anything relevant in Jamila's

medical records that would have been helpful to her defense. She also made a strategic decision not to minimize Jamila's injuries, which were admittedly "brutal," but decided instead "to face them head-on" and point to Glover as the perpetrator. We cannot say that this strategy was "so patently unreasonable that no competent attorney would have followed such a course." *Davis v. State*, 299 Ga. 180, 183 (2) (787 SE2d 221) (2016) (citation and punctuation omitted)).

The medical records that Hart asserts should have been admitted are from pediatric visits in May and June 2014 that focused on Jamila's suspected allergy-related asthma. Hart has not shown how this information would have "impeached" Dr. Sobel's testimony that Jamila died a painful death – several months later – over the course of hours from blunt-force trauma. Accordingly, this ineffective assistance of counsel claim fails. See *Morrison v. State*, 303 Ga. 120, 125-26 (5) (b) (810 SE2d 508) (2018) (no deficiency in counsel's failure to introduce medical-records evidence where counsel testified that the records would not have had any significant

bearing one way or the other on the trial).

(d) Hart also argues that the combined effect of trial counsel's deficient performance requires the grant of a new trial. Because we have identified no instances of deficient performance to cumulate, this claim fails. See *Roseboro v. State*, 308 Ga. 428, 437-38 (2) (c) (841 SE2d 706) (2020) ("Given that neither of [appellant's] enumerations of error amount to deficient performance on the part of trial counsel, [his] argument that the cumulative harm of these failures . . . affected the outcome of trial is without merit." (citation and punctuation omitted)).

4. Hart argues that the trial court erred when it failed to instruct the jury on confession corroboration. As Hart concedes, because she did not object to the omission of this instruction, we review this claim for plain error. See OCGA § 17-8-58 (b).

To establish plain error, Hart must show that (1) the alleged instructional error was not affirmatively waived; (2) was clear and obvious, rather than subject to reasonable dispute; (3) likely affected the outcome of the trial; and (4) seriously affected the fairness,

integrity, or public reputation of judicial proceedings. See *Holloway v. State*, 320 Ga. 653, 659 (3) (911 SE2d 543) (2025). "An appellant must establish all four elements of the test in order to demonstrate plain error, so satisfying this test is difficult, as it should be." Id. (citation omitted).

As noted in Division 2, we are skeptical that Hart's statements to Daughtry – including that Hart had held Jamila's arms over her head so that Jamila could not move while Glover repeatedly beat Jamila with a piece of wood; that Hart never asked Glover to stop even though Glover "lost it" and continued to hit Jamila until "[t]he board broke"; and that Hart left Jamila passed out on the bed – constituted a confession rather than an admission. See *Thomas v. State*, 308 Ga. 26, 30 (2) (b) (838 SE2d 801) (2020) ("A mere incriminating statement is made where the accused, though admitting to damaging circumstances, nonetheless attempts to deny responsibility for the crime charged by putting forward exculpatory or legally justifying facts." (cleaned up)). However, even assuming that Hart's statements constituted a confession, Hart cannot show

that the omission of a confession-corroboration charge likely affected the outcome of the trial. As summarized above, there was sufficient corroboration of Hart's statements to Daughtry, including Dr. Sobel's testimony regarding the extent of Jamila's injuries inflicted over a period of time, Hart's false statements that Jamila had "choked," multiple neighbors' testimony that Hart was present in the apartment when they arrived to assist Jamila, and Freddie Johnson's testimony that earlier in the day, Hart claimed to him that Jamila was sick. Thus, Hart cannot show plain error. See *Davis v. State*, 316 Ga. 418, 423 (3) (888 SE2d 546) (2023) (where there was ample, strongly inculpatory corroborating evidence at trial, appellant could not satisfy the third prong of the plain-error test).

5. Hart also asserts that the State failed to correct Glover's testimony that she had "never admitted to the crime of murder," even though the State knew this testimony to be false, citing *Napue v. Illinois*, 360 U.S. 264, 269 (79 SCt 1173, 3 LE2d 1217) (1959) ("[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth

39

Amendment[.]"). This enumeration fails for several reasons.

"To establish a *Napue* violation, a defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it to go uncorrected when it appeared." *Glossip v. Oklahoma*, 604 U.S. ___, ___ (III) (A) (145 SCt 612, 221 LE2d 90) (2025) (citation and punctuation omitted). Even if a defendant makes this showing, a new trial is warranted only if the false testimony "may have had an effect on the outcome of the trial . . . that is, if it in any reasonable likelihood could have affected the judgment of the jury." Id. (citation and punctuation omitted).

We see no *Napue* violation for several reasons. First, Glover was not called as a witness by the State but by Hart.[11] And it is not at all clear that this principle applies to a defense witness on direct examination. See *United States v. McNair*, 605 F3d 1152, 1208 (IX) (2010) ("When a *government lawyer elicits* false testimony that goes to a witness's credibility, we will consider it sufficiently material to warrant a new trial only when the estimate of the truthfulness and

---

[11] In fact, the State did not even cross-examine Glover at trial.

reliability of the given witness may well be determinative of guilt or innocence." (emphasis supplied; citation and punctuation omitted)); *Daniels v. State*, 349 Ga. App. 681, 684-85 (3) (824 SE2d 754) (2019) ("A defendant's right to due process is violated when a prosecutor fails to correct the false testimony of a *government witness.*" (emphasis supplied; citing *United States v. Clark*, 442 Fed. Appx. 540, 543-44 (II) (11th Cir. 2011)).

Even assuming that *Napue* applies under these circumstances, we do not see there is a "reasonable likelihood [that the alleged false testimony] could have affected the judgment of the jury." *Glossip*, 604 U.S. at ___. Although Glover was uncooperative as a defense witness and attempted to downplay her role, she admitted at trial that she was serving a life sentence in Pulaski State Prison for pleading guilty to Jamila's murder. Thus, it is highly doubtful that any attempt by the State to correct Glover's statement that she "never admitted to the crime of murder" would have affected the judgment of the jury. See *Smith v. State*, 320 Ga. 825, 838 (2) (912 SE2d 563) (2025) ("A determination of materiality [under *Napue*]

41

requires an examination of the statements at issue in the context of the entire record."); *DeLoach v. State*, 308 Ga. 283, 294-95 (3) (840 SE2d 396) (2020) (rejecting appellant's claim under *Napue* and concluding that the false statement was not material where it would have been in the State's interest to correct the witness's statement and the witness's credibility was otherwise undermined at trial).

Moreover, the State's theory throughout the trial was that Glover and Hart together caused Jamila's death, not that Hart was solely responsible. Thus, Hart has not shown how the State allegedly used testimony from Glover that she had not admitted to committing the murder in the State's case against Hart, and we have found no instances of the State using this evidence to argue that Hart was solely responsible for the murder.[12] See *Wimes v. State*, 293 Ga. 361, 363 (3) (744 SE2d 787) (2013) ("[C]onviction of a crime following a trial in which perjured testimony on a material point is knowingly

---

[12] Although the opening statements and closing arguments were not transcribed, the prosecutor testified at the motion for new trial hearing that the State's theory of the case was that Glover and Hart "joined together and beat four-year-old Jamila to death."

*used by the prosecution* is an infringement on the accused's Fifth and Fourteenth Amendment rights to due process." (emphasis supplied; citation and punctuation omitted)); *United States v. Kallen-Zury*, 629 Fed. Appx. 894, 898 (II) (11th Cir. 2015) ("[A] State may not *knowingly use false evidence*, including false testimony, to obtain a tainted conviction[.]" (emphasis supplied; citation and punctuation omitted)); *McNair*, 605 F3d at 1208 (IX) ("To establish prosecutorial misconduct for the use of false testimony, a defendant must show the *prosecutor knowingly used perjured testimony*, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material." (emphasis supplied)). Accordingly, this enumeration of error fails.

6. Lastly, Hart argues that the cumulative harm from each of the above enumerations of error requires the grant of a new trial. However, because we have only assumed one possible error, i.e., that the trial court failed to give a confession-corroboration charge, there cannot be any cumulative error that would require a new trial. See *Thomas v. State*, 311 Ga. 573, 579 (6) (858 SE2d 504) (2021)

(cumulative error analysis does not apply when there are not multiple errors to consider cumulatively).

*Judgment affirmed. Peterson, CJ, Warren, PJ, and Bethel, Ellington, Colvin, and Pinson, JJ, concur. LaGrua, J, concurs specially in part.*

PINSON, Justice, concurring.

I join the Court's decision in full, including the conclusion that the policy this Court adopted in *Thornton v. State* remains in force at this time. In particular, given this Court's limited appellate jurisdiction, I agree that the only understanding of *Thornton* that makes sense is that it is a policy decision to grant certiorari review in each case in the class of murder cases not already covered by Paragraph III (8) once the case is appealed. I write separately to make clear that this policy decision, particularly as it has evolved over time, should not be understood as reflecting the scope of our certiorari jurisdiction as a general matter.

The Georgia Constitution grants this Court jurisdiction to "review by certiorari cases in the Court of Appeals which are of gravity or great public importance." Ga. Const. of 1983 Art. VI, Sec. VI, Par. V. The *Thornton* policy as it currently stands departs from the proper understanding of our certiorari jurisdiction in two ways.

First, that policy is not consistent with our longstanding construction of the standard for granting review by certiorari. That

standard asks whether a case is "of gravity or great public importance." Id. Although we have expansive discretion to determine whether that standard applies in a given case, we have generally understood and applied it to exclude review "merely to correct an asserted error, particularly when the asserted error concerns only the sufficiency of evidence, the correctness of factual findings, or the application of a properly stated rule of law to the facts of a particular case." See Ga. S. Ct. R. 40 (1). See also *Mobuary v. State*, 312 Ga. 337, 341 (862 SE2d 553) (2021) (Nahmias, CJ, dissenting) ("[T]his Court routinely sees petitions for certiorari that identify errors made by the Court of Appeals, including case-dispositive errors that are always of importance to the petitioners who lost in that court but often present no issue of 'gravity or great public importance,' which is why we also routinely deny those petitions."); *Central of Georgia Ry. Co. v. Yesbik*, 146 Ga. 620, 621-622 (91 SE 873) (1917) (addressing the 1916 constitutional amendment granting the certiorari power and explaining that the Court "should be chary of action in respect to certiorari, and should

not require by certiorari any case to be certified from the Court of Appeals for review and determination, unless it involves gravity and importance"). But many of the cases in the class of murder cases not already covered by Paragraph III (8) — the class of cases we decided in *Thornton* to review as a policy matter — simply do not meet that standard as we have applied it to every other case in which a party petitions our court for certiorari. That said, we have continued to apply the well-settled construction of this standard after *Thornton*, and that construction, not the relaxed one implicit in *Thornton*'s policy, remains the proper construction of the standard for granting certiorari.

Second, as the *Thornton* policy has evolved in practice, it may have deviated from our certiorari jurisdiction in another way. That jurisdiction is limited to review of "cases *in the Court of Appeals*." Ga. Const. of 1983 Art. VI, Sec. VI, Par. V (emphasis added). The *Thornton* policy itself was consistent with this language at the time we adopted it: we directed the Court of Appeals to transfer these cases to us after they were docketed in the Court of Appeals. But

47

these days, appeals from murder cases are uniformly docketed directly in our Court without making a stop in the Court of Appeals, likely as a matter of judicial economy. If a case has never been "in" the Court of Appeals, however, there is a serious argument that our certiorari jurisdiction does not extend to that case. See William Tidd, The Practice of the Court of King's Bench 329 (3d ed. 1803) (describing how, at common law, a writ of certiorari "lieth where the king would be certified of any record *which is in*" the lower court (emphasis added)); Ga. Const. of 1798 Art. III, Sec. I (giving superior courts "power to correct errors *in inferior judicatories* by writs of *certiorari*" (first italics added)); Ga. L. 1916 at 19 (amending the constitution to grant the Supreme Court the power to issue writs of certiorari for the first time, which allowed a case "to be certified . . . *from the Court of Appeals for review*" (emphasis added)).[13] That

---

[13] Of course, if we were to determine that these cases are not properly docketed in our Court directly, the remedy would be to transfer the case to the Court of Appeals, see OCGA § 5-3-13 (b), which would then, in keeping with the *Thornton* policy, transfer the case back to us. My point here is merely that the *Thornton* policy does not reflect the way our certiorari jurisdiction works as a general matter.

straightforward understanding of our certiorari jurisdiction is neither addressed nor foreclosed by today's decision or the practice of docketing *Thornton*-policy cases in our Court without a stop in the Court of Appeals.

Because I do not understand the Court's decision to be inconsistent with these views, I join it in full.

LAGRUA, Justice, concurring specially.

In Division (1) of today's decision, a majority of the Court takes the position "that *Thornton* correctly concluded that the change of text in the 1983 Constitution meant that this Court no longer had jurisdiction over non-death penalty murders cases[,]" and disapproves of language used in a handful of decisions that asserted appellate jurisdiction consistent with *Thornton*'s transfer order "to the extent that the language of those decisions suggests that our jurisdiction over those cases came from Paragraph III (8) instead[.]" See Maj. Op. at -- and n.-. I disagree and see a sound basis for our appellate jurisdiction in some non-death penalty murder cases under the Constitution of Georgia of 1983, Article VI, Section VI, Paragraph III (8). However, because I concur with the majority opinion that a separate basis for our appellate jurisdiction also exists under the Constitution of Georgia of 1983, Article VI, Section VI, Paragraph V, and it is on that basis which the majority opinion asserts jurisdiction before reaching the correct judgment in this case, I concur specially as to Division (1).

Our Constitution provides, among other jurisdictional bases, that the Supreme Court "shall have appellate jurisdiction" in eight specified "classes of cases" "unless otherwise provided by law." Ga. Const. of 1983, Art. VI, Sec. VI, Par. III. Among those eight classes of cases are "[a]ll cases in which a sentence of death was imposed or could be imposed." Ga. Const. of 1983, Art. VI, Sec. VI, Par. III (8) (hereinafter "Paragraph III (8)"). Members of this Court have debated the extent of our jurisdiction under Paragraph III (8) for nearly half a century, beginning with *State v. Thornton*, 253 Ga. 524, 524 (1) (322 SE2d 711) (1984). There, the State appealed an unfavorable pre-trial suppression ruling in a murder case to the Court of Appeals which, in turn, transferred the appeal to this Court. Id. Faced with our first opportunity to interpret the newly enacted language of Paragraph III (8), we failed to interpret the constitutional language at all. See id. Instead, we summarily concluded:

> The district attorney did not give timely notice to the defense that the state intended to seek the death penalty . . . and for this reason this is not a case "in which a

sentence of death was imposed or could be imposed." Constitution of Georgia of 1983, Art. VI, Sec. VI. Par. III (8). Hence, this appeal was filed properly in the Court of Appeals.

Id. We then said: "As a matter of policy, however, we deem it appropriate, at the present time, that all murder cases be reviewed by this court." Id. And, to effectuate our *sua sponte* policy determination, we entered an order directing the Court of Appeals to "transfer to the Supreme Court all cases in which either a sentence of death or of life imprisonment has been imposed upon conviction of murder, and all pre-conviction appeals in murder cases, whether or not timely notice was given by the district attorney[.]" Id. The *Thornton* transfer order has been rightly criticized by my colleagues past and present. See, e.g., *State v. Murray*, 286 Ga. 258, 266 (2) (a) (687 SE2d 790) (2009) (Nahmias, J, dissenting) (describing *Thornton*'s "troubling" policy-based jurisdictional holding as "a proposition seemingly at odds with the fundamental principle[s] underlying our democratic system of government"). Yet, today's decision "decline[s] to retreat from *Thornton*'s transfer

order[.]" Maj. Op. at --.[14]

Underpinning *Thornton*'s policy-based transfer order was the conclusion – unsupported by any textual analysis – that we lacked jurisdiction to entertain the appeal because the case before us was not one "in which a sentence of death was imposed or could be imposed." 253 Ga. at 524 (1) (citing Paragraph III (8)). And the only reason for that, per the *Thornton* Court, was because the district attorney prosecuting Thornton did not timely give notice of the State's intent to seek the death penalty – a requirement under the Unified Appeal Procedure if the death penalty is to be sought in a particular case. Id.[15] In other words, the death penalty could not be

---

[14] I concur with the majority opinion to the extent it concludes that we may "retain jurisdiction over this and other non-death-penalty murder appeals pursuant to our certiorari jurisdiction." See Ga. Const. of 1983, Art. VI, Sec. VI, Par. V (hereinafter, "Paragraph V"). However, the majority opinion suggests in error that *Thornton* "is best understood as reflecting" that conclusion. See Maj. Op. at --. *Thornton* made no mention of Paragraph V, and then-Justice Nahmias's concurrence in *Murray* is the impetus for the idea that *Thornton*'s jurisdictional holding "can be supported" by Paragraph V. See 286 Ga. at 266 (b) (2). The fact that Paragraph V can support *Thornton*'s questionable holding does not mean *Thornton* itself stands for that proposition.

[15] The Unified Appeal Procedure, promulgated by this Court consistent with OCGA § 17-10-36 (a) and (b), requires prosecuting attorneys to "state whether he or she intends to seek the death penalty[,]" during the "First

sought (or ultimately, imposed) against Thornton in that particular case because the district attorney did not give timely notice of the State's intent to do so. According to the *Thornton* Court, this case-specific fact, wholly unrelated to the nature of the underlying offense or its associated penalties, meant that we lacked appellate jurisdiction under Paragraph III (8).

Today's decision does not attempt to defend *Thornton*'s jurisdictional analysis with respect to Paragraph III (8) – nor could it. Instead, it relies on former Chief Justice Benham's special concurrence in *Weatherbed v. State* to carry the day. See 271 Ga. 736, 739-741 (524 SE2d 452) (1999) (Benham, CJ, concurring specially). According to the majority opinion, that one-justice writing "provided the textual analysis supporting *Thornton*'s conclusion[,]" See Maj. Op. at --. While I am unpersuaded by former Chief Justice Benham's textual analysis for the reasons set out

---

Proceeding," which is to be held "[a]t the earliest possible opportunity after indictment and before arraignment[.]" See Unified Appeal Procedure, Rule II (C) (1) (accessible at https://www.gasupreme.us/other-codes-rules/) (last visited June 11, 2025). See also Georgia Uniform Superior Court Rule 34.

below, I fully agree with the foundational point at its heart: "From the addition of new language, we presume that some change in existing law was intended." *Weatherbed*, 271 Ga. at 739 (Benham, CJ, concurring specially) (citing *Balest v. Simmons*, 201 Ga. App. 605 (1) (a) (411 SE2d 576) (1991)). See *Barrow v. Raffensperger*, 308 Ga. 660, 672 (3) (c) (842 SE2d 884) (2020) ("When constitutional language is substantively changed, we must give that change effect."). Certainly, the change in relevant constitutional text from the 1976 Constitution (and its predecessors) to the current and operative 1983 Constitution must mean something. I am just not convinced that the change in language resulted in the change in meaning described by former Chief Justice Benham and echoed by today's decision. Allow me to explain.

As an initial matter, former Chief Justice Benham's special concurrence appears to begin from a faulty premise as it relates to the pre-1983 jurisdictional regime. That special concurrence posits that, "[i]n *State v. Thornton* . . . this Court recognized that the 1983 Constitution's grant to this Court of jurisdiction over 'cases in which

55

a sentence of death was imposed or could be imposed' does not embrace all murder cases, *as the previous statement of jurisdiction had.*" *Weatherbed*, 271 Ga. at 739 (Benham, CJ, concurring specially) (citing *Collins v. State*, 239 Ga. 400 (2) (236 SE2d 759) (1977)) (emphasis supplied). See also id. at 741 (describing *Thornton*'s transfer order to have "continued the jurisdictional line drawn by the 1976 Constitution"). But this Court's jurisdiction did not "embrace all murder cases" before 1983. Instead, we had jurisdiction in all "cases of conviction of a capital felony."[16] See Ga. Const. of 1976, Art. VI, Sec. II, Par. IV; Ga. Const. of 1945, Art. VI, Sec. II, Par. IV; *Garcia-Jarquin*, 314 Ga. at 557-558 (Bethel, J, concurring) (observing consistency in jurisdictional language used

---

[16] In *Collins*, we reiterated our longstanding view that "the expression 'capital felony,' when used in our law, is merely descriptive of those felonies to which the death penalty is affixed as a punishment under given circumstances to distinguish such felonies from that class in which under no circumstances would death ever be inflicted as a penalty for the violation of the same." See 239 Ga. at 402 (2) (citing *Caesar v. State*, 127 Ga. 710, 712 (57 SE 66) (1906)). Therefore, in light of the United States Supreme Court's decision in *Coker v. Georgia*, 433 U.S. 584 (97 SCt 2861; 53 LEd2d 982) (1977), and our precedent in *Gregg v. State*, 233 Ga. 117 (210 SE2d 659) (1974), we held in *Collins* that convictions for rape, kidnapping, and armed robbery (where the victim is not killed) "are no longer convictions of capital felonies for appellate jurisdictional purposes[.]" 239 Ga. at 402-403 (2).

in the 1945 and 1976 Constitutions) (citations omitted).[17] While the former "cases of conviction of a capital felony" language was in effect, our appellate jurisdiction turned on two considerations: (1) whether the case at issue involved a capital felony offense (like murder), and (2) whether the case at issue that involved that capital felony offense (like murder) resulted in a conviction. Thus, in the "cases of conviction of a capital felony" era, we did not have jurisdiction in "all murder cases" because pre-conviction appeals in capital felony cases were properly had in the Court of Appeals. See, e.g., *Robinson v. State*, 209 Ga. 48, 48-49 (1), (3) (70 SE2d 514) (1959) (transferring appeal from writ of error in rape case to Court of Appeals for lack of jurisdiction because "there has been no trial, and the Supreme Court has jurisdiction in criminal cases as such only when there has been a conviction of a capital felony") (citations omitted); *McCrary v. State*, 215 Ga. 887, 889 (1) (114 SE2d 133) (1960) ("The mere fact

---

[17] See also *Neal v. State*, 290 Ga. 563, 567-568 (722 SE2d 765) (2012) (Hunstein, CJ, concurring) (explaining that "all cases of conviction of a capital felony" were first conferred upon this Court for jurisdictional purposes after creation of the Court of Appeals in 1906) (citations omitted).

that a capital offense is charged in an indictment does not give this court jurisdiction of a criminal case, but there must be a *conviction* of a capital felony.") (citation omitted; emphasis in original); *Spell v. State*, 225 Ga. 237, 237 (167 SE2d 642) (1969) (transferring appeal to Court of Appeals for lack of jurisdiction because "there had been no trial upon the murder charge" and the case had not yet resulted in a conviction); *State v. Watson*, 143 Ga. App. 785, 785 (240 SE2d 194) (1977) (asserting jurisdiction over appeal from pre-trial suppression ruling), disapproved on other grounds, *State v. Strickman*, 253 Ga. 287, 287 (319 SE2d 864) (1984); *State v. Dubose*, 161 Ga. App. 144, 145-146 (291 SE2d 39) (1982) (same). See also, *Murray*, 286 Ga. at 265 n.9 (2) (a) (Nahmias, J, concurring) (observing that "only appeals from capital felony *convictions*" were within this Court's jurisdiction under the pre-1983 Constitutions) (emphasis in original).

In addressing *Thornton*'s jurisdictional holding, former Chief Justice Benham explained his view "that the 1983 Constitution did not give this Court appellate jurisdiction of an appeal wherein the

defendant, though charged with murder, could not receive the death penalty." 271 Ga. at 740 (Benham, CJ, concurring specially). After pointing to *Rhyne v. State*, 264 Ga. 176, 177 (442 SE2d 742) (1994) as an instance of this Court's "continued" recognition of *Thornton*'s case-specific and fact-bound jurisdictional approach,[18] he then set out his reading of the 1983 constitutional language:

> Given the use of the past tense, the phrase "cases in which a sentence of death was imposed," can only mean cases in which a defendant has been sentenced to death as a result of the judgment of conviction being appealed. The phrase "or could be imposed," on the other hand, speaks to the future and is applicable to those cases in which the possibility of the imposition of the death penalty still exists. Under current Georgia law, that would encompass the interim review phase of death penalty cases authored by the Unified Appeal Process (Uniform Superior Court Rule 34), and interlocutory appeals in cases where the defendant has been charged with a crime punishable by death and the time within which the district attorney must give notice of intent to seek the death penalty has not yet expired. See USCR 34.

---

[18] Justice Nahmias observed in his *Neal* concurrence that, as of 2012, *Rhyne* was "the only case in which we have directly applied [*Thornton*'s] holding." 290 Ga. at 573 (Nahmias, J, concurring) (citation omitted). See also, *Murray*, 286 Ga. at 265 n.9 (2) (a) (pointing to *Rhyne* as an example of a case "follow[ing] that holding") (citation omitted). Much like *Thornton*, the jurisdictional holding in *Rhyne* is unsupported by any textual analysis. See 264 Ga. at 177. To date, most – if not all – of our cases relying upon *Thornton* as the basis for this Court's jurisdiction do so under the guise of its policy-based transfer order.

*Weatherbed*, 271 Ga. at 740-741 (Benham, CJ, concurring specially).

My primary concern with former Chief Justice Benham's view is that it does not consider the full text of Paragraph III. See *Elliott v. State*, 305 Ga. 179, 186 (II) (B) (824 SE2d 265) (2019) ("[W]hen we determine the meaning of a particular word or phrase in a constitutional provision or statute, we consider text in context, not in isolation.") (citation omitted).[19] Specifically, his approach failed to give effect to the key organizing and structural principle of Paragraph III, which confers upon this Court appellate jurisdiction in specified "classes of cases." Instead, his textual analysis looked to Paragraph III (8) in isolation.[20]

---

[19] See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012) ("Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, *in view of its structure and of the physical and logical relation of its many parts*.") (citation omitted; emphasis supplied).

[20] I agree with former Chief Justice Benham and my colleagues that the sum class of "cases in which a sentence of death was imposed *or* could be imposed" is properly interpreted as two sub-classes of a greater whole. See *Weatherbed*, 271 Ga. at 740-741 (Benham, CJ, concurring) (taking a bifurcated approach in examining the text of Paragraph III (8)); *Garcia-Jarquin*, 314 Ga. at 564 (Bethel, J, concurring) (observing that "the language of the 1983

In Justice Bethel's concurrence in *Garcia-Jarquin*, he articulated a view that the 1983 Constitution "changed the jurisdictional definition from the crime (capital felonies) to the punishment (cases in which a sentence of death was imposed or could be imposed)." 314 Ga. at 558 (Bethel, J, concurring). It is also plain to me that the sum class of cases specified in Paragraph III (8) now speaks in terms of actual or possible punishment (as opposed to speaking in terms of the crime at issue), and that it is the punishment of death, either in actuality ("was imposed") or possibility ("could be imposed"), which is the trigger for our jurisdiction.[21] In my view, however, ascertaining whether the death

---

Constitution draws a distinction between two classes of cases over which this Court has jurisdiction: cases in which the death penalty was imposed *or* could be imposed") (emphasis in original). See also *Walton Elec. Membership Corp. v. Ga. Power Co.*, 320 Ga. 740, 750 (2) (a) (911 SE2d 559) (2025) ("We have long observed that the word 'or' is generally used in a disjunctive sense to signal alternatives.") (cleaned up).

[21] There has been no debate among members of this Court with respect to the "was imposed" sub-class of cases within Paragraph III (8). And I agree with former Chief Justice Benham this sub-class is comprised of "cases in which a defendant has been sentenced to death as a result of the judgment of conviction being appealed." *Weatherbed*, 271 Ga. at 740-741 (Benham, CJ, concurring specially). It strikes me that the sub-class of cases in which a sentence of death "was imposed" reflects one half of the pre-1983 jurisdictional

penalty is possible – that is, whether the death penalty "could be imposed" with respect to a given case on appeal – should not turn on practical considerations or case-specific facts unrelated to the nature of the underlying offense and its associated punishments. That case-specific and fact-bound practical approach was the one taken by the *Thornton* Court (and reiterated by former Chief Justice Benham's special concurrence in *Weatherbed*), but it is one that gives no effect to the phrase "classes of cases" as used in Paragraph III. See *Thornton*, 253 Ga. at 524 (1); *Weatherbed*, 271 Ga. at 740-741 (Benham, CJ, concurring specially). The *Weatherbed* majority opinion, however, observed that such case-specific facts unrelated to the nature of the underlying offense do not change the top-line classification of a given case as it relates to its possible punishments. See 271 Ga. at 738-739 ("Under the definition [of capital felony] used in *Collins*, malice murder is a capital felony because it belongs to a

---

calculus – the prerequisite of a conviction – but, unlike the pre-1983 jurisdictional regime, the 1983 Constitution now mandates that the penalty of death have actually been imposed as a result of that conviction for our jurisdiction to attach in this "was imposed" sub-class.

class of case in which the death penalty can, under certain circumstances, be imposed. The fact that the State has chosen not to pursue the death penalty does not change the *class* of case to which it belongs.") (internal citations omitted; emphasis in original). In sum, I submit that, when evaluating our appellate jurisdiction under Paragraph III (8)'s "could be imposed" sub-class of cases, we should ask whether the death penalty "could be imposed" in the abstract for the underlying offense, and if so, our jurisdiction attaches.[22] After all, it is the nature of the underlying offense (i.e., "capital" or "not capital") which permits the State the option to seek the death penalty as a possible punishment in the first place, and no amount of revisionist history can divorce the tie between the crime and its possible punishment.

Not only does this approach align with the historical treatment

---

[22] In this sense, I view the "could be imposed" sub-class of cases within Paragraph III (8) to reflect the second half of the pre-1983 jurisdictional calculus – the prerequisite of a capital felony – but, unlike the pre-1983 jurisdictional regime, the 1983 Constitution no longer requires that the capital felony have resulted in a conviction for this Court's jurisdiction to attach in this "could be imposed" sub-class. See *Collins*, 239 Ga. at 402 (2) (defining what makes a felony "capital").

of a capital felony (like murder) as being a unique crime warranting unique punishment,[23] but it also gives effect to Paragraph III's organizing principle into "classes of cases" and aligns with the principle that a change in constitutional language indicates a change in meaning. See *Barrow*, 308 Ga. at 672 (3) (c) ("When constitutional language is substantively changed, we must give that change effect."). As explained above, it is my view that when the 1983 Constitution was enacted, this Court's jurisdiction was substantively changed insofar as it was no longer limited to post-conviction appeals in capital felony cases (like murder), but was expanded to include pre-conviction appeals in capital felony cases (like murder) and post-conviction appeals in capital felony cases (like murder) that are death penalty eligible as a class,[24] even if the

---

[23] "The denomination of certain crimes as capital felonies is an expression of our society's view that these crimes are more heinous than other classes of crimes, with murder being the most heinous of all capital felonies. It follows that defendants convicted of capital felonies, particularly murder, should be and are treated differently than defendants convicted of non-capital felonies and misdemeanors." *Luther v. State*, 255 Ga. 706, 708 (1) (342 SE2d 706) (1986) (citation omitted).

[24] Other capital felony offenses that are death penalty eligible, like treason and aircraft hijacking, would also fit within our jurisdiction under this

death penalty is not actually imposed on the specific defendant.[25]

The approach articulated above also does not result in the "was imposed" sub-class being rendered surplusage. See Maj. Op. at – (relying in part on the surplusage canon to discredit the *Neal*

approach. OCGA § 17-1-30 (a) (authorizing imposition of the death penalty for those offenses). See OCGA § 16-5-1 (e) (authorizing imposition of the death penalty for murder). However, as *Collins* demonstrates, federal and state constitutional considerations can render certain offenses ineligible for the death penalty as a class, despite statutory authorization for that punishment as a possible outcome. See *Collins*, 239 Ga. at 402-403 (2). When that occurs, the offense itself is no longer classified as a capital felony offense because "under no circumstances would death ever be inflicted as a penalty" for the same. Id.

[25] In this respect, I agree with the *Neal* concurrence that the 1983 Constitution "did not change our jurisdiction to hear and decide appeals involving life-imprisonment murder convictions." 290 Ga. at 569 (Hunstein, CJ, concurring). However, I also agree with the majority opinion that the *Neal* concurrence is flawed. Putting aside the majority opinion's suggestion that transcripts from the Select Committee on Constitutional Revision are essentially meaningless to this equation – a proposition plainly at odds with what all seven justices on this Court (including then-Justice Benham) thought just 13 years ago – I disagree with the ultimate point made by the *Neal* concurrence that the 1983 Constitution "was intended to maintain the existing jurisdiction of the appellate courts." Id. at 571 (Hunstein, CJ, concurring). Like Chief Justice Benham's concurrence in *Weatherbed*, the *Neal* concurrence also failed to take into account that pre-conviction appeals in capital felony cases belonged in the Court of Appeals before 1983. Thus, while the *Neal* concurrence was correct in stating that the 1983 Constitution "maintain[ed] the existing jurisdiction of the appellate courts[]" with respect to "appeals involving life-imprisonment murder convictions" – i.e., post-conviction murder appeals – the *Neal* concurrence was mistaken in its view that the 1983 Constitution "maintain[ed] the existing jurisdiction of the appellate courts" with respect to appeals in all murder cases, generally.

concurrence).[26] An appeal in a capital felony case where the death penalty "was imposed" requires a conviction and imposition of the death penalty, while a pre-conviction appeal in a capital felony case, or a post-conviction appeal in a capital felony case where the death penalty was available but not imposed, would be included within the sub-class of cases in which a sentence of death "could be imposed." Put differently, the sub-class of cases in which the death penalty "was imposed" naturally excludes cases where the death penalty was not in fact imposed (either because the case has not yet resulted in conviction or because the death penalty was not available as a practical matter), and the sub-class of cases in which the death penalty "could be imposed" naturally excludes those in which it has in fact been imposed. Rather than interpreting the text in a manner that "deprives another provision of all independent effect," which was the result of the *Neal* concurrence's approach to "could be

---

[26] See Scalia & Garner, Reading Law at 176 (explaining that "[i]f a provision is susceptible of (1) a meaning that gives it an effect already achieved by another provision, or that deprives another provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operations, the latter should be preferred").

imposed," what I have described above allows us to take the "preferred" approach and give independent meaning and effect to both sub-classes of cases within Paragraph III (8). See Scalia & Garner, Reading Law at 176.

Additionally, this approach would allow us to avoid some pitfalls of *Thornton*'s case-specific and fact-bound approach. For example, if the majority opinion is correct that "could be imposed" really means "could [still] be imposed" as a practical matter in a specific case, then the action (or inaction) by district attorneys could theoretically dictate appellate jurisdiction in certain cases before those cases are ever brought to trial. That is an approach, and result, which I cannot endorse in this context and one that we have rejected in others. See, e.g., *Ferguson v. Composite State Bd. of Med. Examiners,* 275 Ga. 255, 257 (1) (564 SE2d 715) (2002) (explaining in the context of a mandamus action that the "underlying subject matter" controls whether an appeal is subject to the direct or discretionary appellate procedure, rather than the relief sought or procedure invoked by a litigant in the trial court, "as litigants cannot

67

under any circumstances dictate the procedural or jurisdictional rules of this Court").

Finally, if we truly believe that murder is the "most heinous" crime one can commit in our society, see *Luther*, 255 Ga. at 708 (1), it is perfectly reasonable and appropriate that the State's highest court be charged with considering appeals in those cases. In my mind, this is precisely what Paragraph III (8) represents by conferring mandatory appellate jurisdiction upon this Court for most of those cases. Moreover, because I see Paragraph III (8) as providing a sound basis for this Court's mandatory appellate jurisdiction in some non-death penalty murder cases, I also see it as our constitutional responsibility to consider them. But today, the majority opinion takes a step in the opposite direction, and toward the abdication of our role, by recasting our constitutional responsibility as a mere exercise of our discretion under Paragraph V.